*H. F. Strohecker,* for plaintiff in error. *L. D. Moore,* contra.

---

## MOORE *v.* DOZIER.

1. Where, under the Civil Code, § 2505, on a writ of habeas corpus sued
out against the mother of illegitimate children under twelve years of
age, their custody was awarded to a charitable institution bearing the
name of the "Orphans Home of the South Georgia Conference of the

Methodist Episcopal Church South," on the hearing of another writ of habeas corpus, subsequently sued out by the mother, an objection to the admission in evidence of the record of the proceedings and judgment in the first case, based on the ground that the name showed that the institution to which they were awarded was sectarian in character, and that this was a violation of the constitutional guaranty of religious liberty, was properly overruled, and the evidence was rightly admitted.

2. On the hearing of a proceeding by writ of habeas corpus, under the Civil Code, § 2505, to take the custody of illegitimate children under twelve years of age from their mother and to award their custody to a charitable institution, on the ground that she was a notoriously immoral woman and unfit to rear them and unable to provide for them, that their father or fathers had abandoned them, and that they were being reared under immoral influences likely to degrade their moral characters and devote them to vicious lives, or on the return and hearing of another writ of habeas corpus, subsequently sued out by the mother, seeking the restoration of their custody to her, evidence that her general reputation for chastity in the community where she lived was bad, and that she was generally reputed to be an immoral woman, was admissible, as well as evidence of specific acts tending to show that she was an improper person to have the care and custody of the children.

3. In such a case as that indicated in the preceding notes it was not competent for witnesses to state that in their opinion the mother was an unfit person to rear her children.

4. If a witness has knowledge as to the property of a woman, her occupation or means of support, and the number of her children, the cost of rearing children, or other like facts, he may state the facts within his knowledge, and in addition thereto may give his opinion, based thereon, as to her financial ability to rear such children, on the hearing of a proceeding by habeas corpus to take them from her custody on the ground that she is unfit and unable to rear them. But it is not competent for a witness to state, upon hearsay or reputation, that a woman is unable to rear her children.

5. It was not admissible to prove by the ordinary before whom the first trial was had that he knew the mother of the children only from having seen her at that trial, that his knowledge as to her chastity and reputation was based entirely on what he heard from evidence at such trial, and that from that evidence he would say that such reputation was bad.

6. Section 2505 of the Civil Code was not repealed by the act of 1904 touching the committing of children in certain cases to charitable institutions (Acts 1904, p. 93).

Argued March 14,—Decided April 11, 1907.

Habeas corpus. Before Judge Felton. Bibb superior court. June 13, 1906.

This was a contest between a mother and a charitable institution,

for the possession of her three children under twelve years of age. Upon a proceeding by writ of habeas corpus, brought by a citizen against the mother, alleging that the children were illegitimate, that the mother was poor and unable to provide for them, that she was a notoriously immoral woman and unfit to rear them, that the father or fathers had abandoned them, and that they were being reared under immoral influences likely to degrade their moral characters and devote them to vicious lives; and upon the intervention of the superintendent of the South Georgia Conference Orphans' Home, the children were awarded and committed to the home. Fourteen months later the mother made application for a writ of habeas corpus, to have the children returned to her custody. She contended that she had reformed, had become a consistent member of the church, and was living a correct, upright life. She admitted that she was poor, but asserted that she was living with her father and working for him, and that with the assistance he was willing to give she was able to provide for the children. The defendant contended that she was still of an immoral character, unsuitable and unable to rear the children, and that for their interest they should not be returned to her keeping. The ordinary before whom the proceeding was taken refused to restore the children to the mother's custody. The case was carried to the superior court by writ of certiorari, and the judgment of the ordinary was there affirmed and the writ dismissed. The petitioner excepted.

*Nottingham & McClellan,* for plaintiff.

*Hardeman & Jones,* for defendant.

LUMPKIN, J. Cases of this character are becoming so common that there may be at times danger of losing sight of the fact that they involve principles which lie at the basis of society and of government. They include no less a question than the determination of where the right of the individual to his or her own children must yield to their good and that of society, of which they are members. Ordinarily a father, or if no father the mother, has a right to the custody of his or her children. Civil Code, §§ 2502, 2503. The mother may be poor, but poverty alone, save in extreme cases, furnishes no reason to deprive her of her children. The rich can not say to the lowly, "You are poor and have many children. I am rich and have none. You are unlearned and live in a cabin. I am learned and live in a mansion. Let the State take one of your

children and give it a better home with me. I will rear it better than you can." The hovel has its rights as well as the palace. The ties of motherhood too are not to be lightly disregarded. The Mosaic account of the creation completes but three short chapters when the fourth opens with the glad cry of motherhood, as Eve said, "I have gotten a man from the Lord!" And from then till now the deepest, the tenderest, the most unswerving and unfaltering thing on earth is the love of a mother for her child. The love of a good mother is the holiest thing this side of heaven. The natural ties of motherhood are not to be destroyed or disregarded save for some sound reason. Even a sinning and erring woman still clings to the child of her shame, and, though bartering her own honor, will rarely fail to fight for that of her daughter. A mother who will wilfully sacrifice her daughter's virtue is so rare as to be looked upon as a moral monstrosity. The law recognizes that although a woman may have made a misstep, this does not necessarily render her unfit to have the care of her child; for the Civil Code (§ 2509) declares that the mother of an illegitimate child is entitled to its custody.

While this is true, and the rights arising from nature are not to be lightly set aside, yet where people form society and establish a government for their mutual welfare and protection, they must yield something of their individual rights for the common good. The children of the State to-day are to be the men and women of to-morrow—the citizens, the fathers and mothers. While the State will not usurp the place of the parents, it will look to the protection of the children from suffering or degradation. If the parent so far fails in his or her duty that the child is in destitution and suffering or is abandoned, or is being reared under immoral, indecent, or obscene influences, likely to degrade it and bring it to a life of vice, the State may interpose its protecting arm and guard the little life against the impending disaster. As was said in *Hunter* v. *Dowdy,* 100 *Ga.* 644, speaking of a female child in a similar case, "Any fate would be better for the child than the disgrace and ruin which would follow her prostitution. No place could be a worse one for her than the home of a wicked and shameless mother." We deem it not amiss to thus mention the serious question which such cases raise—on the one hand the recognition of natural rights and duties, the importance of the relation of parent

and child, and of the family, which is a factor in the upbuilding of the State; and, on the other hand, the right and power of the State to save the little ones from ruin. The judge before whom such a case is brought has no more solemn duty to perform than the awarding of the custody of a child.

1. Turning to the specific questions involved in the present case, objection was made to the admission in evidence of the record of the former proceeding in which the-ordinary awarded the custody of the children to the orphan's home. The ground of objection was that it is contrary to the spirit, if not the letter, of our constitution guaranteeing religious liberty, for the courts to commit children to a sectarian institution. There is nothing before us save the name of the home (the Orphans' Home of the South Georgia Conference of the Methodist Episcopal Church South) to indicate what is the character of the institution, except a statement in the record that it is a charitable institution. There is nothing alleged or shown as to the manner in which it is conducted. And we can not take judicial cognizance from this that there is anything unconstitutional in sending children there. The question determined on the former trial does not appear to have been one involving religious freedom of either the children or the mother, but whether it was necessary to take the children from her custody to save them from want and degradation. The record of the commitment was properly admitted in evidence.

2. Objection was made to the admission of evidence that the general reputation of the mother of the children for chastity was bad. One of the grounds provided by law (Civil Code, §2505) for taking the custody of a child under twelve years of age from its parents is if it "is being reared up under immoral, obscene or indecent influences likely to degrade its moral character and devote it to a vicious life, and it shall appear to such ordinary by competent evidence, including such examination of the child as may be practicable, that by reason of the neglect, habitual drunkenness, lewd, or other vicious habits of the parents or guardians of such child, it is necessary to the protection of such child from suffering, or from degradation, that such parents or guardians shall be deprived of the custody of such child, such ordinary may commit such child to any orphan asylum or other charitable institution established according to law in this State which is willing to receive

such child." In determining the character of the place and sur-
roundings under which children are being reared, the general repu-
tation of the place and the persons dwelling there is admissible.
Thus if it were sought to show that they were kept in a lewd house,
the reputation of the place could be proved. This is even true in
a criminal case. *McCain* v. *State*, 57 *Ga.* 390; *Hogan* v. *State*,
76 *Ga.* 82; *Braddy* v. *Milledgeville*, 74 *Ga.* 516; *Gossett* v. *State*,
123 *Ga.* 437. Whether reputation alone would authorize the taking
of a child from its parent is a different question.

3. Witnesses were allowed to testify, over objection, that in their
opinion the mother was an unfit person to rear the children. This
was the question which the ordinary was called on to decide. As
a general rule, "the opinion of a witness is not admissible in evi-
dence when all the facts and circumstances are capable of being
clearly detailed and described so that the jurors may be able readily
to form correct conclusions therefrom." *Mayor of Milledgeville* v.
*Wood*, 114 *Ga.* 370; *Thomas* v. *State*, 122 *Ga.* 151; *Mayor of
Macon* v. *Humphries*, Id. 800; *Central Ry. Co.* v. *Goodwin*, 120
*Ga.* 83 (1); *Moran* v. *State*, Id. 846 (1); *Southern Mutual In-
surance Co.* v. *Hudson*, 115 *Ga.* 639 (2). In *Sumner* v. *Sumner*,
118 *Ga.* 590, a similar principle was applied to the hearing of a
habeas corpus case brought by a mother to obtain the custody and
control of her minor children. A witness was offered to testify
that in his opinion the relations existing between the mother and
a certain man named were improper and inconsistent with her fi-
delity to her husband, stating several facts on which he based such
opinion; and also that from statements made by the petitioner
and her husband in the presence of the witness, he would say that
the man mentioned left under pressure brought about by the dis-
covery of the relations existing between him and the petitioner.
This evidence was excluded, as appears from the record on file.
Evidence touching the character, conduct and reputation for lewd-
ness of the mother, and other evidence tending to throw light on
the question at issue, was admissible; but it was not competent for
witnesses to testify generally that they thought that the mother was
an unfit person to rear her children.

4. Objection was also made to the evidence of certain witnesses
that the mother was unable to rear them. Solvency or insolvency
or poverty can not be proved by mere hearsay. *Molyneaux* v. *Col-*

*lier,* 13 *Ga.* 407; *Phillips* v. *Bullard,* 58 *Ga.* 256. It has, however, been held that where a witness knows and states facts in regard to the financial condition of a person, he may, in connection therewith and founded thereon or derived therefrom, state his opinion as to the insolvency of the person under consideration. *Crawford* v. *Andrews,* 6 *Ga.* 244. In *Riggins' executors* v. *Brown,* 12 *Ga.* 271, 273, a former sheriff, who had held a fi. fa. and had gone to the house of the defendant to make a levy, testified, after stating these facts, that in his opinion the defendant had personal property sufficient to have satisfied the execution. This was apparently stated on the basis of what he saw on that visit, and it was held competent. Under these rulings, if a witness had opportunity for observation as to the means of support of the mother, her occupation, the number of children, the cost of supporting the children, or other like facts, it would be competent for him to testify on the basis of the facts so narrated as to her financial ability to support the children. But it was not competent to testify from reputation or hearsay as to her ability to rear them.

5. The ordinary before whom the former trial was had was allowed to testify, over objection, that he knew the petitioner, the mother of the children, only from having seen her on the day of the trial before him; that his knowledge as to her chastity and reputation was based entirely on what he heard from the evidence at such trial; and that "as to her general character for chastity in the community in which she lives, I only know what was developed by the witnesses at said trial. From that evidence I would say such reputation is very bad." He was also permitted to testify that the evidence then introduced before him showed that she had no income and was entirely dependent upon her labor as a field hand on her father's farm. Evidence that a person is poor, or has no income, because some other person said so, even under oath, is so palpably hearsay and inadmissible as to need no discussion. Strictly speaking, the words "reputation" and "character" are not synonymous. Character is what a man or woman is morally, while reputation is what he or she is reputed to be. Reputation is the estimate which the community has or expresses of a person's character; and if the reputation is bad, this is treated as evidence, where general character is involved. *Leverich* v. *Frank,* 6 Oregon, 212, 213. General reputation has been defined in various ways,

among them being that it is what a person's neighbors generally say of him (Treschman v. Treschman, 28 Ind. App. 219, 61 N. E. 961) ; that it is the concurrence of many voices to the same fact (Deputy v. Harris, 1 Mary. (Del.) 104, 40 Atl. 714, 715) ; that a woman's reputation for chastity is what the people of her acquaintance generally say of her in this regard (State v. Bryan, 34 Kans. 72, 8 Pac. 260, 266). And the reputed character of a person has been said to be the slow-spreading influence of opinion, arising out of the deportment of an individual in the society in which he moves, as distinguished from his real character, which is that impressed by nature, traits, or habits upon the person. Wright v. Crawfordville, 142 Ind. 642 (42 N. E. 227, 229) ; 7 Words & Phrases, 6118. It has been declared that a witness as to character must speak from his own knowledge of what is generally said of such person by those with whom he resides and with whom he is chiefly conversant. 5 Am. & Eng. Encyc. Law (2d ed.), 880. In Douglas v. Toutsey, 2 Wend. 352 (20 Am. Dec. 616), it was held that where a witness was sent into a neighborhood in which a person formerly lived, to learn her character, and was told that it was bad, this was not such a knowledge of general character as authorized him to testify in regard to it. It was said that it would be unsafe to rely upon the testimony of a party's agent, sent into a community an entire stranger, it may be, to collect information to subserve his principal's view in the suit. In the same case the evidence of a witness who knew nothing of the plaintiff's character except what he had heard said by two persons from the place of her former residence, who attended as witnesses at a previous trial, was rejected. In Curtis v. Fay, 37 Barb. 64, it was held that knowledge of the general character of a witness sought to be impeached must be founded upon an acquaintance and intercourse with the neighbors and acquaintances of such witness, sufficient to enable the person called to testify in regard to it to gather the general estimation in which the witness is held in the community where he resides. It was said that to allow the impeaching witness to testify that he did not himself know anything of the other's reputation, and that all he could state on the subject was what some persons at the place where the other lived, and whom he did not know, told him it was, "would be nothing but reputation of repu-

tation." See also Gaines *v.* Relf, 53 U. S. (12 Howard) 554; *Columbus & Rome Ry. Co.* v. *Christian,* 97 *Ga.* 56, 61.

While general character is shown by general reputation in the community where a person resides or where he does business or frequents, a witness must state that he knows the general reputation, before he can swear to it. On cross-examination he may be asked touching the sources of his knowledge. But it is not competent for him to testify that he does not know the general reputation of the person under consideration, and that he merely heard certain evidence on a former trial, and from it he thinks such reputation bad. It might be interesting, but not pertinent, to consider the origin and growth of the rule by which general reputation came to be treated as proof of or synonymous with general character. A discussion of this subject will be found in 3 Wigmore on Evidence, §1981 et seq.

It is contended that the judgment of the ordinary, approved by the judge of the superior court on writ of certiorari, was without evidence to support it. As the case must be again tried, we express no opinion upon this subject, further than to say, that upon the hearing of a writ of habeas corpus involving the custody of children, the presiding judge is vested with broad discretion; that he should consider the legal evidence before him, including that bearing upon the question as to whether or not there has been a reformation or a change of circumstances which would render it proper to restore the children to the mother's custody (*Kirkland* v. *Canty,* 122 *Ga.* 261), or whether she is still an immoral and improper person to rear them, and whether it is necessary for the protection of such children from suffering or from degradation that their custody by others should be continued. The relation of parent and child is not to be overlooked or disregarded without sufficient cause, but the moral and physical safety and interest of the children must also not be forgotten. Schouler's Domestic Relations (5th ed.), §248; *Haire* v. *McCardle,* 107 *Ga.* 777. The proceeding under which the children were committed to the home was taken under the Civil Code, §2505. That section was not repealed by the act of 1904 (Acts 1904, p. 93).

*Judgment reversed, with direction. Fish, C. J., absent. The other Justices concur.*