SELMA RISTING, by E. J. RISTING, Appellant, v. CARL SPARBOE et al., Appellees.

PARENT AND CHILD: Custody of Children—Right of Parent—Welfare of Child. A surviving parent has no *absolute* right to the custody of his minor child. The welfare of the child is paramount. *Held,* the welfare of the child in question demanded that its custody remain with an aunt, in preference to being delivered to the surviving father in order that he might place

it in the custody of another aunt, the sole purpose being that a small expense might be saved to the father and his convenience somewhat subserved. See Section 3193, Code, 1897.

**EVIDENCE:** Presumption—Welfare of Child. The law strongly 2 presumes that the welfare of a child will be best subserved in the care and control of its parents. *But the presumption is rebuttable.*

*Appeal from Hamilton District Court.*—Edward M. Mc-Call, Judge.

Saturday, May 12, 1917.

Habeas corpus proceedings in behalf of Selma Risting by her father resulted in an order restoring the child to the custody of defendants. The plaintiff appeals.—*Affirmed.*

*J. E. Burnstedt,* for appellant.

*O. J. Henderson,* for appellees.

Ladd, J.—The child involved in this

1. PARENT AND CHILD: custody of children: right of parent: welfare of child.

case, Selma Risting, was born April 26, 1910, and therefore was a few days less than 5 years old at the time of the trial. She lived with her parents on a farm in Murray County, Minnesota, until the summer of 1913, when her mother became ill, and started out for treatment, taking the child with her. She visited two places before reaching Heron Lake, Minnesota, where she underwent an operation, and, after remaining there four weeks, proceeded to the home of her sister, Mrs. Hotchkiss, a physician living in Webster City, where she died, December 19, 1913. In the meantime, her husband, who brings this action in the name of the child, found time to visit her between trains at Heron Lake, and at Webster City on November 18th, and more frequently thereafter. She had reached the latter place in so helpless a condition as that she was carried from the train, with but 10 cents in money, and, upon presentation of the account for her treat-

ment and care at the hospital, Risting forwarded it to her, with the suggestion that she borrow the funds, as he could not get "the money for all this just now." However, he owned 160 acres of improved land, of the value of $75 per acre, and had $2,000 or $3,000 worth of personal property. On her deathbed, she extracted a promise from him that the little girl should stay with Mrs. Hotchkiss, and Selma was left there. About January 20th, following, he came after the child. To avoid having her taken, she was removed to the home of Mr. and Mrs. Sparboe, the latter a sister of the deceased wife's, as it was thought he would be more willing to leave her with them. After considerable parley, he concluded to do so, and the only understanding had is that to be inferred from a conversation in which he said he would leave her, and Mrs. Sparboe replied that she "did not like to take the child and then have him come and take her away after our folks became attached to her," to which he responded that he "would not do that." Though this is denied by Risting, the court might well have found the conversation to have been as recited. The child remained with defendants, and Risting returned to his home in Minnesota. In the following summer, defendants took the child to see her father, and when they were about to leave, he directed them to leave her with Mrs. Ramsdahl, a sister of his deceased wife's, who resided near St. James, Minnesota. They did not do so, and, subsequently, Risting apologized by letter for what he had said. Early in the next year, Risting, after visiting several days in the neighborhood of defendants' home, demanded the custody of the child. This was refused, and this suit was begun March 17, 1916.

The evidence disclosed that Risting lives alone on his farm, and did not intend to take his daughter there, but to place her, if awarded him, in the custody of Mr. and Mrs. Ramsdahl, and that his only reasons for desiring such change were that the Ramsdahl home was about 30 miles

nearer his farm, and to visit the child would cost him several dollars less than were she to remain with defendants; and also, he felt more at home at Ramsdahls' than with defendants. On the other hand, defendants do not claim that the child was given to them, nor that they are entitled to the permanent custody of the child. Nor does Mrs. Hotchkiss claim her. All contended by defendants is that the best interests of the child require that she continue where she is, owing to her condition and the circumstance that Risting is asking for her custody not in order to care for the child himself, but to transfer her to another of the child's aunts.

Though Risting's treatment of his wife is subject to just criticism, it seems to have been owing to no design, but to have been owing to a selfish nature, lacking in appreciation of the tenderer relations of life. This accounts for his having twice punished the child during his brief stay at the Hotchkiss home, she then being past 3 years old, and it is further evidenced in the persistency with which he is insisting on the change of the abode of the child, without apparent consideration for her welfare, and solely for his own convenience and a small saving in expense. Otherwise, as a father, he appears to be subject to no just criticism. But utter selfishness alone cannot be allowed to cut off the natural claim of parents to the custody of their own offspring.

2. EVIDENCE: presumption: welfare of child. Human experience has demonstrated that children ordinarily will be best cared for by those bound to them by the ties of nature, "bone of their bone and flesh of their flesh." Something more than the material things of life is essential to the nurture of a child, and that something is the father's and the mother's love, or as near its equivalent as may be. Recognizing this, the law raises a strong presumption that the child's welfare will be best

subserved in the care and control of parents, and in every case, a showing of such relationship, in the absence of anything more, makes out a prima-facie case for parents claiming the custody of their children. "Indeed," as said in one case, "this presumption is essential to the maintenance of society, for without it, man would be denaturalized, the ties of family broken, the instincts of humanity stifled, and one of the strongest incentives to the propagation and continuance of the human race destroyed."

At the common law, the right to custody was in the father, but Section 3192 of the Code declares that parents are "equally entitled to their care and custody;" and Code Section 3193, in effect, that, on the death of one, the other shall be entitled to such care and custody. Some of the earlier decisions seem to have treated the right of the father to the custody of the child as paramount, even absolute, except in cases of gross abuse of parental authority, and expressions seemingly in approval of such doctrine may be found in opinions of this court. See *Van Auken v. Wieman,* 128 Iowa 476; *Brem v. Swander,* 153 Iowa 669. The more recent opinions, however, quite generally regard the welfare of the child as paramount, in cases of this character. This is on the theory that every child is born a citizen, and is vested with the rights and privileges of citizenship entitling it to governmental protection; and the government can meet its obligation to protect only by consulting the welfare of the child in regulating its custody during the period of its minority. Thus it was said, in *Wilson v. Mitchell,* 48 Colo. 454 (30 L. R. A. [N. S.] 507):

"In controversies affecting the custody of an infant, the interest and welfare of the child is the primary and controlling question by which the court must be guided. This rule is based upon the theory that the state must perpetuate itself, and good citizenship is essential to that end. Though nature gives to parents the right to the custody of their

own children, and such right is scarcely less sacred than the right to life and liberty, and is manifested in all animal life, yet among mankind, the necessity for government has forced the recognition of the rule that the perpetuity of the state is the first consideration, and parental authority itself is subordinate to this supreme power. It is recognized that: 'The moment a child is born, it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated by its duty of protection to consult the welfare, comfort and interest of such child in regulating its custody during the period of its minority.'"

In *Moore v. Dozier*, 128 Ga. 90 (57 S. E. 110), is to be found the following, by Lumpkin, J.:

"Where people form society and establish a government for their mutual welfare and protection, they must yield something of their individual rights for the common good. The children of the state today are to be the men and women of tomorrow—the citizens, the fathers and mothers. While the state will not usurp the place of the parents, it will look to the protection of the children from suffering or degradation. If the parent so far fails of his or her duty that the child is in destitution or suffering, or is abandoned, or is being reared under immoral, indecent, or obscene influences, likely to degrade it and bring it to a life of vice, the state may interpose its protecting arm and guard the little life against the impending disaster."

See *In re Gould*, 174 Mich. 663 (140 N. W. 1013).

In this class of cases, three interests are involved—of the parents, of the state, and of the child; and, of these, the most important and controlling is that of the child, for by a proper decision as to that, the other interests are best subserved. *Commonwealth v. Wise*, 3 Pa. Dist. 289.

Recognition of what is for the best interest of the child will seldom interfere with the natural rights of the parent

to the custody thereof, and never unless essential to its welfare or for the good of society.  Enough has been said to indicate our disapproval of appellant's contention that the surviving parent has the absolute right to the custody of his minor child, and to express our approval of the more wholesome doctrine that, in a habeas corpus proceeding to determine the right to such custody, the primary consideration for the guidance of the court is the welfare of the child.  *Hadley v. Forrest*, 112 Iowa 125; *Kuhn v. Breen*, 101 Iowa 665; *McDonald v. Stitt*, 118 Iowa 199; *Smidt v. Benenga*, 140 Iowa 399; *Shaw v. Nachlwey*, 43 Iowa 653; *Drumb v. Keen*, 47 Iowa 435.  See cases, generally, collected in note to *Hickey v. Thayer*, 41 L. R. A. (N. S.) 564 (Kan.).

The paramount interest of the parent is mentioned in some cases, as in *Smidt v. Benenga*, 140 Iowa 399; but in that case, the expression is not used concerning such interest as compared with that of the child, for the decisions of this court have turned on a determination of what is best for the child, and the paramount interest of the parent is spoken of with reference to others asserting right to the custody.  Appellant insists that a parent may not be denied the custody of his minor child save on a showing that he has parted with right thereto by voluntary agreement, or has abandoned the child, or is totally unfit to care for it.  Any of these grounds may be sufficient to warrant awarding such custody to another, but the enumeration is not complete, nor will the courts undertake to specify the particular circumstances which will be persuasive and controlling.  What should be done depends on the peculiar facts of each particular case.  Here the child is of tender years, and is being cared for in a family entertaining a genuine affection for her, and a home affording every comfort.  Her religious training is in accordance with the tenets of the church of her father.  She is of delicate health

and of nervous temperament. Mrs. Hotchkiss testified that:

"As a physician, I should say that moving the child around is a detriment to her health; it is a great detriment to move her around from place to place. She already has an intermittent pulse—heart—and any undue excitement might produce a lesion. She has certainly improved in the state of Iowa; she is very much better."

The record leaves no doubt that the Ramsdahls are excellent people, but their testimony disclosed that they were ready to care for the child merely because of relationship and the request of the father, and without any special interest in and affection for her. Their home may be as good a home as that of defendants, but not for this child, who will be best nurtured where love for her abounds. Though her father may feel more at home at Ramsdahl's home, he speaks in kindly terms of the Sparboes, and nothing in the record indicates any barrier to his visiting his child there as often as he may choose. Indeed, his insistency on the change cannot well be attributed to other than want of appreciation of the needs of the child. The trial court saw her, as well as others interested in the case, and we are inclined to the opinion that the evidence was such that we ought not to interfere with its finding; that the best interests of the child would not be subserved by her transfer to the home of the Ramsdahls, inasmuch as such finding has the force of a verdict of the jury. Were Risting in a situation to care for her personally in a home of his own, a different conclusion must have been reached.—*Affirmed*.

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.