IN RE GUARDIANSHIP OF ROBERT RICHARD MCFARLAND.

EVERETT MCFARLAND, Appellee, v. CLAUDE C. TAYLOR, Guardian, Appellant.

No. 40681.

418

Ferguson & Ferguson and Keenan, Barnes & Clovis, for appellant.

Stephens & Thornell, for appellee.

WAGNER, J.—The contest herein as to the right of custody of a seven-year-old boy is between the plaintiff, the father of the boy, and the maternal grandfather. The father is twenty-seven years of age and the grandfather fifty-nine. For a full understanding of the case, it will be necessary to refer to the married life of the father and mother of the boy. At the time of the marriage of the father and mother, October 13th, 1920, the father was eighteen years of age and the mother not quite fifteen. Apparently, the marriage was consummated with the approval of the wife's parents. The boy in question was born in March, 1922. While, after the marriage, the young husband worked at various jobs which he could find to do, it was his ambition to become a printer, and he accepted a position as ap-

prentice in a newspaper office. While his wages at the inception of his apprenticeship were small, yet they increased as time progressed, and he became more proficient; and the record fairly discloses that the young man worked laboriously and successfully to learn the trade of linotype setter, which was the pursuit he desired to follow. While not owning a home of his own, and living in a rented apartment, it appears that, as the result of his labor, he was able to support himself and youthful wife. It is true that, a short time before the boy was born, the expectant mother went to the home of her parents until sometime after the birth of the baby. In so far as the record discloses, there was nothing to mar the happiness and prospects of this couple until the summer of 1925, when the husband contracted pulmonary tuberculosis. It is fairly shown by the record that the husband's physical condition and his inability on account thereof, during the period of disability, to provide the young wife with the comforts of life caused her love for him to wane and lessened the regard which, no doubt, she should have maintained for him in his affliction. The young husband was taken to the Sanitorium at Oakdale for treatment, where he remained for approximately two months, when he came to the home of his wife's parents, in Shenandoah, where for about a year he took what we shall term the "rest cure" for his affliction. One room of the Taylor home was so fixed that two sides thereof consisted almost wholly of windows. A "Close to Nature" tent was obtained by plaintiff's father and was erected in the yard in front of the Taylor house. During the period when he was at Oakdale for treatment, and when he was at the Taylor home as aforesaid, his wife and boy resided with the Taylors. During this period, the young wife obtained employment in the May Seed Store. Before going to Oakdale, their household furniture was sold in order to help in their finances. Plaintiff's father, while not a man of very great means, gave to the son, before his going to Oakdale, the sum of $50.00 and to his wife the sum of $10.00. The plaintiff's father thereafter made some contributions, admitted by Mrs. Taylor, for the support of the plaintiff's family. The husband held a policy of insurance which provided for the payment of $10.00 per month during the period of his disability, and upon his order, his wife received the same. There can be no question, as disclosed by the record, that both his

420

parents and her parents were exceedingly kind to this husband and his family during this tragic period.

In August, 1926, the plaintiff, with his wife and son, left the Taylor home and went to the home of his parents in West Bend. In November, 1926, the wife and son returned to Shenandoah because of tonsil trouble with which the boy was afflicted, and which they desired a physician at the former home to treat. The McFarlands invited the young wife to return to their home with the boy, but the invitation was not accepted. The plaintiff is not shown to be extravagant, and nowhere does it appear in the record that any money was needlessly expended by him. Sometime during the summer of 1927, the husband was advised by his physician that he could work, say, half time. He sought employment and did work at his trade in various places, returning to work in newspaper offices in Shenandoah about July 1st, 1927, where he remained until sometime in the autumn of that year. During this period of time, he, with his wife and son, were living in an apartment. The owner of the apartment testified that, upon their leaving, the wife told her that she would go and stay with her parents and they would each go for the winter, and when he came back they would engage the rooms again for the family. The wife told her that there was no trouble at all; that they were just leaving for the winter. This witness further testified that they were a quiet peaceable family and appeared to be happy. It appears that after his leaving Shenandoah, he obtained employment at his trade at Clarion. About Christmas time, he wrote his wife of a contemplated visit by him to Shenandoah. About January 8th, 1928, he came to Shenandoah and went to the Taylor home, and his wife refused him admittance unless he would agree to go to the hotel and stay all night. He went in and saw the boy, and in conformity to his wife's wishes left the home. Manifestly, before his leaving Shenandoah there was talk between him and his wife relative to a divorce; for on January 10th, 1928, a stipulation was signed by the McFarlands, which provided that Bertha L. McFarland was contemplating starting an action for divorce. This agreement provides:

"Now, therefore, for the purpose of making arrangements for the proper care and support of their child, Robert R. McFarland, who is now five years old, it is stipulated and agreed by

the above parties as follows: That in case a divorce is secured by the said Bertha L. McFarland from the said Richard E. McFarland, she is to have the custody of said child from September first until June first of each year. During the balance of the year the said Richard E. McFarland is to have the custody of said child. Each party is to support, clothe and properly care for the said child during the time that each has the custody of him. Either party shall have the privilege of visiting the said child while he is in the custody of the other party at all proper hours and times. This agreement as to custody of the child shall be in effect so long as these parties are living apart, whether an action for divorce has been started or a divorce granted.''

Richard E. McFarland mentioned in said contract is the plaintiff in this action. On January 31, 1928, the wife wrote the plaintiff that she had received his two letters and read them. ''From now on any letters received from you will be returned unopened.'' On February 2, 1928, she wrote her husband:

''I will write you once a week to let you know how Robert is. I guess that much is due you, but that is all I care to write about. You can write to Robert the same as you have been, but I would rather you did not write to me, and when you write to him, please don't tell him to kiss me for you. If you don't stop I won't even open Robert's letters.'' etc.

On February 13, 1928, she wrote the plaintiff, among other things, as follows:

''I have tried to write you decent letters before and it doesn't seem to do any good. Now I'll try this. I don't want to hear from you in any way, so don't write me any more letters, don't send any special delivery or important, don't call up for I will not talk. Just pretend that I am so far away you can't reach me in any way, or that I am dead if you want to, anything but don't attempt to write me any and don't send any in Robert's letters either. I don't love you and I will never live with you again, one of us is going to get a divorce, so you just as well hop to it and get it.''

On February 15, 1928, the wife wrote the plaintiff that she wanted him to get the divorce on the ground of desertion, ''and

make it snappy. * * * You don't need to send an answer to this letter, because it will be refused, so go ahead and get the divorce because I am just the same as gone any way, because I am refusing everything that comes from you from this day on.'' The wife filed a petition, asking for a divorce, and notice was served upon the husband on April 27th, 1928. On June 9, 1928, the plaintiff wrote his wife the following letter:

''My dear Wife: I still love you. If you should want to begin life over again with me I am sure we can be happy. No one will ever love you as much as I do, and as we have been through so many hardships together and as we have Robert it would be a shame to break it all up now. Sweetheart, don't you think we can love and be happy? Love from your husband, Everett.''

It will be noted from the foregoing stipulation that each party was to provide for the support and was to clothe and properly care for the child during the time that she, or he, had the custody of him, and that the husband was to have such custody only during the months of June, July, and August. It is shown by the record that during the summer of 1928, the boy remained with his mother in the Taylor home, although the father asked for him. It is shown that the mother took sick, just when is not clearly shown by the record, but she died March 14, 1929. In the latter part of the year 1928, the plaintiff, having fully regained his health, began to work full time when he could find employment. He, at this time, accepted employment from one of the publications in Shenandoah. His rooming place was about a block from the Taylor home. During his wife's sickness, he frequently wrote to Mrs. Taylor and called in person at the home, making inquiry as to the health of his wife, ''until Mrs. Taylor told me she would rather I didn't come any more.'' ''When I first came there, they met me and let me see her. After that they didn't, but I asked them regularly if there was something I could do, when I went to the door to see Robert. At the time of my wife's death I went to the home and asked to go in, and they refused to let me go in.''

The record shows that, relative to the divorce suit, the plaintiff paid the amount required by the court (presumably tempo-

rary alimony). The husband appeared and filed an answer in the action, which was not tried, and a few days after the death of the wife, the record shows a dismissal.

The medical testimony is to the effect that the plaintiff is now cured. The case was tried in February, 1930, and the plaintiff's physician testified: ''I examined him last approximately a year ago. At that time he was what we call a fast case. He was healed up. He showed all evidence of being thoroughly healed up. At that time he was not suffering from any tuberculosis,'' and that from his knowledge of him, and his examination of him as a physician, he would be a suitable person to have the custody of his boy. There is no testimony to the contrary.

The plaintiff now has a permanent position with the Clarinda Journal, is working full time, and receives from $35.00 to $40.00 per week, depending upon the amount of overtime work which there may be for him to perform. He was married September 28, 1929. He is maintaining a home in a rented apartment. He desires the custody of his boy, and his wife testified:

''If the custody of this child should be awarded to my husband, I would be willing to take him into my home and have him there, and take care of him as a mother would. I would do my best.''

On February 5, 1929, the district court of Page County entered of record an order appointing the defendant as guardian of the person of the boy. On the following day, a petition, duly signed by the mother of the boy, asking for said appointment was filed. On February 11th the district court of Page County entered of record an order authorizing the defendant, as guardian, to petition the Superior Court of the city of Shenandoah for the adoption of the boy, and on the following day an application for the order was filed in the Clerk's office. On February 11, 1929, the Superior Court of Shenandoah granted an order providing for the adoption of the said boy by the Taylors. The plaintiff had no knowledge whatever of the proceeding for the appointment of a guardian, nor of the pretended adoption of his boy by his maternal grandparents. The testimony clearly shows that this father has a great interest in and truly loves the boy, and that the boy also loves his father. The testimony of the school-teacher is to the effect that the father frequently, almost

daily, met his boy at the schoolhouse at the time of the noon intermission, and this long before the present trouble arose. The testimony further discloses that shortly after the wife's death, without notice to him and without any knowledge on his part of the guardianship or adoption, he took possession of his boy and started with him, where is not shown by the record, but probably to the home of his parents at West Bend; that at the instigation of the Taylors, he was arrested, and he and the boy taken from the train at Van Wert and brought back to Shenandoah, charged by the Taylors with the crime of kidnapping his own boy. He was released on his own recognizance, and nothing further has been done in regard to a criminal prosecution. Other facts, as shown by the record, will be mentioned as we proceed.

The trial court, by his decree, set aside the order of the court bearing date February 5, 1929, by which the defendant was appointed guardian of the person of the boy, and also set aside and held for naught the aforesaid order of the court granted on February 11, 1929, and found that the plaintiff is a "fit, suitable and proper person to have the custody of, to rear, educate and care for his son, Robert Richard McFarland; that the plaintiff, Everett McFarland, is financially able to be entrusted with the care, custody and education of his son; that the best interests and welfare of Robert Richard McFarland demand that his father be entrusted with his sole custody and care," and awarded the plaintiff the custody of the boy.

The first question for our determination is whether the order of court appointing the grandfather as guardian of the person of the boy is of any validity as affecting the rights of the plaintiff-father to his custody. Section 12573, Code, 1927, provides:

"Parents are the natural guardians of the persons of their minor children, and equally entitled to their care and custody."

Section 12574, Code, 1927, provides:

"The surviving parent becomes such guardian, but, if there is none, the district court shall appoint one, who shall have the same power and control over his ward as the parents would have, if living."

During the lifetime of the mother, both she and the plain-

tiff were the natural guardians of the boy, and upon her death, according to the statutory law, in the light of our previous pronouncements, the husband became entitled to his custody, unless it be that he had abandoned the child, or forfeited or waived his rights to his custody, or unless it be that he is not a fit and suitable person to have his custody and the best interests of the child require that his custody be entrusted to others. See Miller v. Miller, 123 Iowa 165; Brem v. Swander, 153 Iowa 669; Jensen v. Sorenson, 211 Iowa 354. The question of the best interests of the child will be hereinafter considered. The appellant, at this point, relies upon Sandine v. Johnson, 188 Iowa 620. In that case, the father of the child was dead, and the mother, the sole surviving natural guardian, was insane, and a guardian was appointed for the person of the child on the theory that there was no surviving parent competent to act as such guardian of the person; and we held that in such event, the action of the court in appointing a guardian of the person was valid, and that the rights arising under the acts of said guardian would prevail over the rights of the mother as natural guardian of the child, even after she had regained her mentality. In said case we also took into consideration the best interests of the child. We have no such situation in the instant case; for the father, at the time of the appointment of the defendant as guardian, was, and at all times since has been, mentally competent and otherwise qualified to assume his full duties as such natural guardian. The cited case is clearly distinguishable from the instant case.

The appellant also relies upon our recent pronouncement in Jensen v. Sorenson, 211 Iowa 354; but the facts in the instant case are clearly distinguishable from the facts in the cited case. In the cited case, we said:

"The conduct and attitude of the plaintiff (father) bears upon the question of waiver, forfeiture, and abandonment. If one or all of these be made to appear, not only must the plaintiff fail in his suit, but the decree of adoption must be recognized as valid."

In the cited case, the father acquiesced in the appointment of a guardian for his child. This is not true in the instant case. We also held in the cited case that the father had abandoned his child, and, by reason of his conduct therein set out, had waived

and forfeited his rights as natural guardian to the custody of his child. The conduct of the plaintiff in the instant case is just the reverse of the conduct of the father in the cited case. In the instant case there has never been an abandonment by the father of his right as natural guardian to the custody of his boy.

In the event that the action for divorce had been tried and a divorce granted, it would have been the duty of the court to have made such order in relation to the custody and maintainance of the child as he should have deemed right and proper. See Section 10481, Code, 1927. And this is true, regardless of any contract relative to the custody of the child between the contesting parties. However, it was perfectly proper for the father and mother to contract relative to their rights to the custody of the child during the period of time that they should remain husband and wife,—that is, prior to the time of the rendering of a decree of divorce. In the aforesaid contract, the husband and wife agreed that the wife should have the custody from September first until June first, and the husband from June first to September first. By this act, the husband did not abandon the child; he only entered into an amicable arrangement of a temporary character. See Miller v. Miller, 123 Iowa 165. By this act, the husband did not give his consent to the custody of the child, except to his wife, and only as therein limited and specified. Under this arrangement, the wife could not legally bestow the custody of the child to any person to the exclusion of the rights of her husband. The acts of the plaintiff, as shown by the record, clearly demonstrate that there never was any thought or intent on his part to abandon his child. As hereinbefore stated, the record shows that in the divorce action the plaintiff-father paid the amount required by the order of the court. The record fails to disclose any act of either commission or omission on the part of the plaintiff-father indicating an abandonment of his boy, and it abounds with evidence showing to the contrary.

Did he waive his right to the custody of the boy? Waiver is the voluntary relinquishment of a known right. The action of his former wife and her parents, secretly instigated by them to bring about the appointment of her father as guardian of the person of the boy and the subsequent adoption, was without any

notice to him and without any knowledge on his part; and very soon after acquiring knowledge of said matters, upon his arrest for the charge of kidnapping his own boy, he caused this action to be brought. It is quite clear that, under the record, there has been no waiver by him of his right to the custody of his son.

Does the record show any forfeiture of his rights? We answer in the negative. Here again, there is no act of impropriety upon his part, no act of either commission or omission, which can be considered as a forfeiture of his rights to the boy. But on the other hand, the record abounds with acts of love and kindly consideration for both the boy and his mother. His acts toward his son have at all times been such as to show the proper regard for one who is "flesh of his flesh and bone of his bone."

It is quite apparent from the record that there has been no abandonment by the father of his son, and no waiver or forfeiture of his custodial rights as the natural guardian of his boy.

Moreover, the guardian was appointed on February 5th, 1929; the petition asking for his appointment, signed by the former wife, was not filed until the next day. Therefore, there was nothing to invoke the jurisdiction or action of the court in making the appointment at the time when it was made. It is quite clear that the trial court was right in setting aside both the order appointing the defendant as guardian of the person of the boy and the order of February 11th, which gave him apparent authority to institute proceedings in the Superior Court for the adoption of the boy, and in holding that the same are of no validity as affecting the custodial rights of the plaintiff to his son.

 The form of procedure in which the aforesaid relief was asked and granted, is proper. See Brem v. Swander, 153 Iowa 669. But as hereinbefore stated, the plaintiff filed an amendment to his application, in which he asks for the custody of the boy. The appellant makes no attack upon said amendment. He only denies the averments thereof. In this manner, the appellant met the issue made by the averments of the amendment as to the rights as between the plaintiff-father and the defendant-grandfather. The entire matter was tried in the trial court without objection by appellant as to the manner of procedure.

The matter was tried as in equity. The rights as between the plaintiff and the defendant were fully determined. It is not now contended by the appellant that the right to the custody of the child should have been determined in an action in habeas corpus. Therefore, we proceed to the consideration of the correctness of the trial court's judgment and decree.

The appellant contends that the boy was legally adopted by him and his wife. Without any valid order of appointment as guardian, all subsequent acts of the one claiming to act as such are of no avail as against the rights of the plaintiff-father. Section 10501-b3, Code, 1927, provides that the consent of both parents shall be given to the adoption, with certain exceptions, none of which exist in the instant case. It further provides that, if the child is not in the custody of either parent, but is in the care of a *duly* appointed guardian, then the consent of such guardian shall be necessary. In the instant case, we have seen that the appointment of the grandfather as guardian had no efficacy as affecting the rights of the father as natural guardian of his boy. In other words, there was no *duly appointed guardian*. The child was not in the care of a *duly appointed guardian,* and the consent of the father to the adoption was not obtained. It is apparent from the record that the secretive action of the mother and her parents constituted an attempt by them to deprive the father of his right of custody as the natural guardian of his boy; but under the record of this case, neither the guardianship proceeding nor the adoption proceedings dependent thereon are sufficient for that purpose.

We have yet to consider the welfare and best interests of the child; for, notwithstanding the provisions of Sections 12573 and 12574, Code, 1927, that the father, as sole surviving natural guardian, is entitled to the care and custody of the boy, yet, under our previous pronouncements, the right of the father to such custody is not absolute, but is determined in view of his fitness for such custody, and the welfare and best interests of the child. See Risting v. Sparboe, 179 Iowa 1133; Lally v. Fitz Henry, 85 Iowa 49; Jensen v. Sorenson, 211 Iowa 354. Many other cases could be cited upon this proposition. Under the law, there exists a rebuttable presumption that the welfare of a child will be best subserved in the care and control of his or her parent. See Risting v. Sparboe, 179 Iowa 1133; Winter v. Win-

ter, 184 Iowa 85; Werling v. Heggen, 208 Iowa 908. In Risting v. Sparboe, 179 Iowa 1133, we said:

"Human experience has demonstrated that children ordinarily will be best cared for by those bound to them by the ties of nature, 'bone of their bone and flesh of their flesh.' Something more than the material things of life is essential to the nurture of a child, and that something is the father's and the mother's love, or as near its equivalent as may be. Recognizing this, the law raises a strong presumption that the child's welfare will be best subserved in the care and control of parents, and in every case, a showing of such relationship, in the absence of anything more, makes out a prima-facie case for parents claiming the custody of their children. 'Indeed,' as said in one case, 'this presumption is essential to the maintenance of society, for without it, man would be denaturalized, the ties of family broken, the instincts of humanity stifled, and one of the strongest incentives to the propagation and continuance of the human race destroyed.' "

We further said in the cited case:

"Recognition of what is for the best interest of the child will seldom interfere with the natural rights of the parent to the custody thereof, and never unless essential to its welfare or for the good of society."

In Winter v. Winter, 184 Iowa 85, we said:

"In such a contest, the father, as the only surviving parent, starts with a very strong presumption in his favor."

The presumption existing in favor of the father has not been overcome in the instant case. The testimony convincingly shows the love of the father for the boy and that of the boy for the father. No witness has declared that the father is not a fit and suitable person to have the custody of his boy. Without any hesitancy, the witnesses testified in favor of the plaintiff-father in this respect. Witnesses so testifying are a banker, the proprietors of the newspaper establishments in which he has been employed, a minister, a physician, and others with whom the plaintiff has dealt and who are perfectly familiar with his habits, reputation, and character. It is clearly apparent from a

reading of the record that there is not a blot upon his reputation nor a blemish upon his character. The witnesses also give similar testimony relative to the good character and fitness of his present wife. The appellant, in his argument, states: ''We have nothing to say against her (the present wife), except that she is a stranger to the child and young and inexperienced.'' She is next to the oldest in a family of nine children. She has a good education, and with her experience in the handling of children, her willingness to take the boy and do her best to ''take care of him as a mother would,'' and the favorable testimony in her behalf, as disclosed by the record, there can be no question that she is also a fit and suitable person to help the father rear the son.

It is argued that the best interests of the child require that the grandfather have the custody of the boy, because he has accumulated property to the extent of $20,000.000 to $25,000.00. It must be borne in mind that the grandfather is thirty-two years older than the father, and has had that much additional time toward the accumulation of the property which he now possesses. He has only one child living, and testified that he has made no will, and that this boy will receive a share of inheritance from him. Without a will, the child will necessarily receive the predeceased daughter's share of his property, upon his death. Unless he wills otherwise, the right of custody cannot affect the property rights of the boy upon the grandfather's death.

If the right of custody to a child, as between the father and grandfather, depends upon the comparative wealth of the two, then in many cases the father must yield the custody of his own flesh and blood to the grandfather. This sort of argument does not strike us as being persuasive. As said in Dunkin v. Seifert, 123 Iowa 64:

''As between persons claiming with equal right, these advantages of wealth and opportunity may have much weight; but as against a man who has never abandoned or surrendered the custody of his child, who is able and willing to give it a decent support, and is morally fit to have it in charge, the wealth or position or moral worth of an opposing claimant is of little moment.''

But the appellant contends that the father should not have

the custody of the child because this seven-year-old boy, upon the witness stand, expressed his desire to remain in the home of his grandfather. It must be apparent that he has not yet reached the age of judgment and discretion. At this point, the appellant relies upon Knochemus v. King, 193 Iowa 1282; but said case is clearly distinguishable from the instant case. In the cited case, the mother having abandoned her boy when a mere babe, after fourteen years asked for his custody as against the foster mother; and the boy expressed his desire to remain with the latter. In that case, we properly gave stress to the expressed wish of the boy. In this case, there has been no abandonment by the father, and the boy has not reached the age where his wishes at this time can be given much, if any, consideration. The boy testified: ''Yes, I like my daddy. I have always liked him. I like to have him visit me. I like him now.'' The grandmother testified: ''I don't mean that Everett (the plaintiff) is not good to Robert. I don't mean that. I don't mean Everett is mean to Robert, because he isn't.'' As said by us in Brem v. Swander, 153 Iowa 669:

''But we find nothing to indicate that, if these two children are restored to their father, they will not, within a reasonable time, be satisfied with their relations to him and his present wife. * * * The youngest is now only six years of age, and therefore not old enough to have any deep-seated preferences.''

Likewise, in the instant case, this child in the home of his father will soon become adapted to and feel satisfied with the new surroundings.

The trial court found from the evidence that the best interests and welfare of the child demand that the plaintiff-father be entrusted with the custody of the child. From a careful reading of the record, we agree with the trial court, and as between the contending parties to this litigation, the judgment entered below is hereby affirmed.—Affirmed.

All Justices concur.