LILIAN E. HADLEY, by her next friend, v. MOLLIE FORREST,
Appellant.

**Custody of Child:** INTEREST OF CHILD. A parent's right to the
custody of an infant child is not absolute, and will not be en-
forced when seriously detrimental to the interests of the child,
which are the paramount consideration.

SAME: *Evidence.* While petitioner was living apart from her hus-
band in New Jersey, she permitted defendant to take her infant
daughter, then 3 years old, to defendant's home, in Iowa, for
a year, after which it was agreed that defendant might again
take the child and keep her until petitioner claimed her. Sub-
sequently, the child's parents were divorced, the decree making
no provision for the custody of the child, and thereafter the
father entered into an agreement with defendant by which she
was to have the care of the child until he signified otherwise;
and the child remained in defendant's care about a year, until
petitioner commenced *habeas corpus* for her recovery. The
evidence showed that petitioner had no means or home, and
that her character was such as to render her an unfit custodian
for the child, while defendant was of excellent character and
standing, and able and willing to give the child a good home
and proper training. *Held* that, in the interest of the child's
welfare, the writ should be denied.

*Appeal from Clinton District Court.—HON. P. B. WOLFE,*
Judge.

THURSDAY, OCTOBER 11, 1900.

THIS is a *habeas corpus* proceeding in which a mother
seeks to obtain the possession of her infant child. From a
judgment depriving defendant of the possession of such
child, she appeals.—*Reversed.*

*Hayes & Schuyler* and *Chase & Seaman* for appellant.

No appearance for appellee.

WATERMAN, J.—John E. Hadley and May W. were
husband and wife, and the parents of the infant in question.

They were married on November 6, 1892, and the child was born on May 26, 1893. For a few months after their marriage they lived together, and then practically separated, although they cohabited together from time to time during the remainder of their married life. In the year 1896 the defendant, whose home is in Clinton, in this state, was visiting at Ocean Grove, N. J., and boarded at the same house where Mrs. Hadley and her child were staying. Defendant and Mrs. Hadley became acquainted, and the former, taking quite a fancy to the child, asked permission to take it home with her to Clinton. After some time the mother consented to this, on condition that the child be returned to her when defendant came East in the following summer. This arrangement was carried out. Defendant took the child to Clinton, and kept it from about September 1, 1896, until the summer of 1897. In August, 1897, having returned the child as she agreed to do, defendant, with the mother's consent, again took it home with her. Defendant was at all times solicitous to have the mother relinquish all claim to the child, but this she was not able to accomplish. When she took it the last time the understanding was that the mother should have it again whenever she desired. The child has remained with defendant since. In March, 1898, John E. Hadley obtained a divorce from his wife in the state of New York, but in the decree nothing was said as to the custody of the child. After the divorce, defendant and John E. Hadley entered into a written agreement by which defendant was to have the care and custody of the child until the father signified otherwise. On March 17, 1899, these proceedings were instituted. Defendant is a very estimable lady, with a good home, and has the ability and disposition to care for and bring up this child in a most desirable manner. In cases like this the court should consider the interests of the child. *Lally v. Fitzhenry*, 85 Iowa, 49, and cases cited. The parent's right to the custody of the child, while recognized and allowed strong weight, is not abso-

lute, and will not be enforced when against the serious interests of the child. It is not meant by this that any person better able than the parents to provide for the wants of an infant child may deprive the natural guardians of its custody; but we do mean to assert that the child's vital welfare, present and future, is not to be sacrificed to the parent's claim.

II. We turn now to the facts. They are not in serious dispute. So far as there is a controversy, we shall notice it in the course of what we have to say. The mother of this child was a professional dancer, appearing at times in music halls in the city of New York. After the separation from her husband she was upon the stage, though she says only for a short time, and, as we understand, claims to have now abandoned the profession. She has no home, other than boarding places, which are changed so often that she is at a loss to tell where she was living at any particular time within the past few years. Her address is, and for some years has been, the general delivery, New York city. Her husband obtained his divorce from her on the ground of adultery. She says this was by her collusion; that she was induced to make an appearance of guilt, and present no defense, in order that her husband might secure a divorce. She insists that she was guilty of no criminal act. We need not set out the facts. It is enough to say that no reason appears in the testimony why the wife should have been specially desirous for her husband to obtain a divorce. We find it difficult to believe that any woman would submit to be falsely decreed an adulteress, whose character was not already so stained as to make her indifferent to another blemish. We think this woman's character, by her own admissions, was such that she may well have been careless as to reflections upon her virtue. While a member of one Riley's burlesque troop she was the subject of charges of some sort made by a mistress of Riley, in which her name was connected in a discreditable manner

with that of Riley. She admits that this got into the New York papers. Later one Mrs. Walton sued for a divorce from her husband, Dr. Alfred Walton, and made charges, not clearly defined in the record, but obviously of a scandalous nature, connecting Mrs. Hadley with her husband. She even came to Mrs. Hadley's boarding house on one occasion, and caused a scene. Mrs. Hadley, of course, denies any wrong doing with Walton; but she is. forced to admit that the intimacy continued after these charges were made, and she also admits having carried on a correspondence with Walton after her marriage. The character of her intimacy with Walton will appear from the letter which we set out. It was written by the doctor to her while she was on a professional tour through the West, evidently after her marriage. It bears no date:

"My Own Dear Love: Miles and miles away from home, for I truly feel that all you have on earth to live for is in New York. To you, the *sole one* aside from my children that I can truly feel that I love, to you I write to relieve me from my solitude, and to give solace and comfort to you, the object of my love and affection. I feel that you need to hear from me, and that my letters are always welcome. Well, dear, I received two of your dear, precious letters today, both in the same mail. I cannot account for that singular coincidence, but the fact remains I did. They were both read with great interest, as in fact are all your letters; and let me tell you, dear, that you write very interestingly. I prize each little word, for they come *from you.* That, from some unaccountable reason, seems so much to me. Do you realize, dear, that in one of your letters you tell me to do so and so for the *baby,* as if *I* was the father of the *baby* and actually obliged to, and I *obey* as meekly as though you were present? I am glad you have not as yet found any *gentleman* to take *my place,* but you have not been *tempted.* The *temptation* will not present itself until you *are at work,* —until you actually show yourself and are successful. Then

it remains to be seen how you will stand temptation. *Flattery* goes a great way, even with a woman that foolishly claims that she does not care for men; and, my dear, you have not as yet met men as you may possibly do *later on,* especially if you are successful. Don't forget, May, that I am in New York and have every possible opportunity in the world to go around, and plenty of horses *to catch* on with, but I cannot *forget my love* away off in Denver. Come back to me, my dear, pure and good. God has made you, dear, as pure and as good as any *living woman that ever breathed the breath of life.* Let me see by your manner, your conduct, and thought that you are not changed, even though you work on the stage for a living. Let your speech and thoughts be pure and good. Your conduct, manner and speech should be of such a character as to present a barrier so firm that no man should feel at *liberty to insult you.* For some reason I cannot help having the greatest and most implicit confidence in you in every respect. Please do not do anything whereby you yourself cannot feel that you deserve such confidence, for I feel that you are *pure in thought* as well as in *deed.* May God bless and care for you, is my *constant prayer.* I am going to see *baby* tomorrow. Good night, my own true love. Kisses * * *."

Mrs. Hadley, by her own admissions, indulged at times in the use of intoxicating liquors. She says that she was temperate in their use, but at the same time confesses that in June, 1898, she was an inmate of the alcoholic ward in Bellevue Hospital, New York, for treatment. We will now let this woman speak for herself, as to her own character, prefacing what she says with the statement that after the divorce, Hadley sent her money from time to time for the support of the child. Finding that but little, if any, of it was used for the child's benefit, Hadley began sending the money direct to Mrs. Forrest, the defendant. Immediately after this Mrs. Hadley wrote her husband's mother to this effect:

"Mrs. Hadley: I write you this so that you can save
your name from another scandal (only a *hundred times*
bigger than any you had yet), and at the same time save
me a lot of unnecessary trouble. You had better advise
your son to give baby up to me at once; for *she* is not *his*
child, and I can *prove* it, *but belongs to me.* There is only
a little more than *six months'* difference between the date of
our marriage and baby's birth, so you can see he can't *pos-
sibly* keep *legally* a child that is *not his own.* You would
not have him the *laughing stock* of *everybody,* would you?
I will stop at *nothing* to get my *baby,* and I am sure you
would not find it very pleasant to have the name of Hadley
*in great big type in all the papers,* and *shouted* from the
housetops, and ringing in *everybody's* ears; but *I'll get my
baby,* I tell you, if the name of Hadley is in every one's
mouth in the *country;* and won't people *ridicule and laugh,*
tho'? Are you aware of the fact that he went to hotels
with me ten or fifteen times between March 15, 1898, and
the time the divorce was granted, and once after, and that
he went up to my mother's flat twice when they were all
there, *after March 15, 1898,* and talked the divorce over,
and told how he got those men to go there? I can prove
that it was *collusion,* and, if he doesn't give up *my* child
*immediately,* I shall have the divorce set aside and sue him
for a separation and alimony. I can *prove,* also, that for
the first four years of baby's life he did not support her, and
I have many letters (letters written five years ago, and sev-
eral written within the past six months and three months)
in which *he says* baby is not *his* child. I also have some
letters written just before we were married which prove
certain things, and I know that he would not like
them to be shown in court or put in the papers,
with their 'my dear little love,' and 'I cannot give
you up, dearest,' etc., in them, and telegrams, some-
times two or three a day, showing how he was run-
ning after me, and how I didn't even *answer his letters.*

I will make him the *biggest fool* for people to *jeer* at you
ever *heard* of, and *everybody* will know about it; and he
won't have *baby* in the end, either. 'A word to the wise' is
sufficient, or should be.   Mrs. May W. Hadley, Gen'l De-
livery, New York."

March 15, 1898, spoken of above, is, as we understand,
the date when the divorce proceeding was begun.   About
this same time—perhaps a little earlier—she wrote the fol-
lowing letter, without date, to her husband, who was travel-
ing for a house that dealt in wall paper:

"You *dirty, rotten yellow dog, you!* You *dare* to say
you will send *baby's* money to *Mrs. Forrest,* and not to *me?*
You *deceitful pup,* you *lying old cur,* if you don't have
some money here by *Friday morning* I will have your *dirty
name ringing all over the city.* It will be a nice sequel to
the *other* scandals.   I'll go to the Gilsey House, the Arena,
the Grand Hotel, the hotel where Mills is (I'll drag him in
the case, too, and air *his* dirty clothes).   I'll go to every
house in Hoboken, and I'll write to every *one you know and
don't know,* and I'll send for the Journal and World re-
porters, and tell all about your old hag of the *mischief-mak-
ing* mother and your old drunken sister, and bring up that
last news-girl scandal, and tell them *why a little girl* has to
work to support *two old drunks,* and I'll tell about
your old *sot* of a brother, and I'll tell them how you were
so willing to have another man support *your child* for three
years, and where you *wrote* to me in *black* and *while* and
*told* me to let him take care of baby, that *you* didn't intend
to, and where you talked about her little face, her nose, etc.,
and how, after forcing your wife, not *half your age,* to sac-
*rifice* herself for you, you *dirty, rotten, yellow dog, you,*
you now virtuously offer to send *some other woman, not her
mother 'what you can afford'* to help take care of her, and
the *mother* to send the rest.   I'll give them all your letters
they *want* to copy, *word for word,* and print, and I'll make
it so *hot for you* you will wish you were *dead.*   I'll get a

wall-paper directory, and I'll write to *every wall-paper manufacturer in the United States.* I'll write and tell Mrs. Forrest all about it, and how *cowardly low* you were to have the *disgrace* of the divorce fall on your *wife* and *little innocent baby.* I *realize exactly now* what you have done to me, and *they* will realize, too, what a *cowardly low brute* of a *beast* you are, and it will be in *every newspaper* in the *city Saturday* morning. They will only be *too glad* to get something besides war news in their papers—a scandal like this, —and *they* know how to *write it up, too.* You gave your *word of honor* (tho' I know *now* you *haven't* any *honor*) that you would act fairly by me after the divorce, and you *have* to keep your word; I'll make you. I will write to that firm (I have the address), and tell them how you bought champagne and charged it to them up in Troy, and tell them how you went away up to Syracuse.    *    *    * Keep up the agreement you made with me before the divorce, or I will put you in the *gutter* (where all the rest of your family are). There is *one thing more* I haven't told you of, or threatened you with, but *that you* shall not know just *yet.* There is time enough for *that,* you *feather-brained old fossil, you.* If you were not in your *dotage* you wouldn't be such a *fool* as to act to me as you are now acting. Your letter has decided me on *one* point. I shall go *immediately* out West (that is, as soon as I have *finished with you*), and take little baby *away* from Mrs. Forrest. How *dared* you say you will send money to *her,* a *stranger,* and not to *me,* her *mother,* who has loved her *all her life and suffered for her?* You *miserable brute,* how *dared* you? I shall teach *baby* to *hate* and *curse* you *with all her soul,* and *you* will suffer *yet* even *more* than I have. If I don't get a letter from you by *eleven o'clock* Friday, I shall have letters posted to *every newspaper* in the *city* by twelve, to have their reporters call on me; and they will *send* them, *too,* and don't you make any mistake about *that.* Another thing

I have to say. I have no more money to buy *stamps* and paper, so after this I shall be *obliged* to write on *postal cards.* You send me money by Friday morning; *also,* money for my chain and locket. You just *dare* to break your word to me, you *dirty, miserable, old, treacherous, mangy, deceitful dog!* I will have you in court for bonds to support *baby,* and I will sue your mother, and drag her miserable, old, wretched bones to court, too, tho' the newspapers will be enough to kill her, when she reads the glaring headlines. I can sue her for alienation, and I'll tell how you forced me to put baby on a baby farm, and how she nearly *died there.* I will pay you back *ten times over* if you don't keep your word to me. I don't want you to send me money very long, but you *shall* keep your word. The firm is still sending you money, and I have a right to some. I'll tell everybody how you pay taxes and buy carpets and keep up that old ranch and buy old *jilted Ann bicycles,* while your own daughter is living on *charity,* and how you insured your life for your old-maid hog of a sister, even *after your baby was born.*"

The emphasis is that of the writer.

Comment on these letters is superfluous. They speak for themselves, and show the writer to be unfit to have the care of this child. If all the facts were as claimed by this woman, they would not excuse or palliate these coarse and indelicate effusions. The writer exhibits in these letters such traits of character as to make it manifest that her influence upon susceptible child nature could not be other than debasing. Although there are serious reflections in the evidence on the character of the husband, it must be remembered that this is not a contest between husband and wife for the custody of the child. The wife is here seeking to take it from a home where she voluntarily placed it, and where its moral as well as physical welfare will receive all needed attention, and where, under proper order of the court, it

might have been kept. The writ should, have been denied. —REVERSED.

GRANGER, C. J., not sitting.