118    199|
132    495|

118    199|
f140   404|

MABEL McDONALD, by Her Next Friend, Mae Chapman, Appellant, v. F. E. STITT AND SARAH STITT, Appellees.

**Habeas Corpus for Custody of Infant:** RIGHT OF PARENT TO RE-POSSESS: EVIDENCE. When a parent voluntarily parts with the custody of an infant child, and seeks to recover it, if the right is doubtful, or the assertion of the claim inequitable to those who have cared for it, or to the child, the welfare of the child is the controlling question. Evidence considered.

*Appeal from Fremont District Court.*—HON. W. R. GREEN, Judge.

SATURDAY, OCTOBER 25, 1902.

HABEAS corpus proceedings to settle a controversy regarding the custody of Mabel McDonald. Mae Chapman is her mother, but defendants have had the child since she was but a few days old. The trial court awarded her to the defendants, and plaintiff appeals.—*Affirmed.*

*William Eaton* for appellant.

*W. E. Mitchell* for appellees.

DEEMER, J.—Mae Murphy, now Mae Chapman, during her early life, was a school teacher connected with the public schools in Iowa and adjoining states. While teaching, she was secretly married to one William McDonald in the territory of New Mexico. This marriage occurred on the 4th day of December, 1890. Becoming pregnant as a result of this marriage, Mrs. McDonald, who was then known as Mae Murphy, at the end of her school term in the spring of the year 1891, went to a "lying-in" institution at Omaha, Neb., and there, on or about September 27 of the same year, was delivered of a child, which is now

the subject of this controversy. The matter of the birth of the child was kept a profound secret, and, to allay suspicion, the mother left the "lying-in" institution, and resumed her school work with the beginning of the term which commenced October 5, 1891. Mrs. Prassil was the matron of the institution, and Mrs. McDonald (now Chapman) says that: "Mrs. Prassil agreed to take care of my baby for the sum of fifty dollars until I could come back at the close of my five months' term of school. She said she would keep her, and she would get good care, and I could send her money in drafts at the end of each month. It was to be at the rate of ten dollars per month,—fifty dollars for the five months,—but she suggested that I send more of it at first. The 31st day of October I sent twenty-five dollars by registered letter from Hamilton, Mo. This was from my first month's wages. Between October 31st and the 1st day of February—I can't give the exact date—I sent fifteen dollars by draft. The 1st day of February I sent postoffice order for ten dollars from Hamilton, Mo., addressed to Mrs. Prassil at her street number in Omaha. I sent fifty dollars in the five months. If I remember correctly, school closed the 20th day of February. The last day of school I went from the schoolhouse to the depot, and directly to Omaha, arriving there the 21st day of February in the forenoon. Arrived at Omaha, I went directly to the house where Mrs. Prassil had been. I did not find her at that place, and did not get any trace of her until about a year ago." The witness then detailed the search she made for the child, resulting in finding her in the possession of the defendants, who were then residing at Kenesaw, in the state of Nebraska. Thereafter defendants moved to Randolph, in this state; and finally to Sidney, where they were residing when this action was commenced.

The matron of the home where the child was born testified: "I know a young woman named Anna Mae

McDonald, or Mrs. McDonald, and in September, 1891, she gave birth to a female child at my place. I gave the child to a party in Ashland, Neb.—a barber by the name of Stitt. I think the child was not more than twelve days old. Mrs. McDonald left my house about three days before I gave the child away. She asked me to find a home for the child, as she was not able to take care of it. I advertised in the Omaha Bee, and a man by the name of Stitt applied for the child. He told me the child would have a good home, and asked me to go with him to his home in Ashland; that his wife would like to have the child, and would be a good mother to it, and he a good father." Mrs. Prassil said to Stitt, when he appeared in answer to the newspaper advertisement, "that the lady that left the child was desirous that it be adopted in a good Christian home." Stitt then said, "Have you found out that it is a good Christian home?" and she said, "I have." Stitt then said: "This lady that gave birth to the child, will she ever appear for this child again?" And Mrs. Prassil answered: "She will not. She is far away from here." Thereupon defendants took the child, and have ever since provided and cared for it as their own. It has had the best of care, and, as defendants have no children of their own, they are greatly attached to it. William McDonald died shortly after his secret marriage to Mae Murphy, and on March 23, 1895, Mrs. McDonald married one Chapman, with whom she lived a short time, but by whom she had a child, which died in the year 1899. Mrs. Chapman has demonstrated by her conduct the natural affection that a mother has for her firstborn, and this mother instinct is so strong that she seems willing to do anything within the bounds of reason to reclaim her child. As against this perfectly natural manifestation of maternal love, we find on the other side that the child has so grown into the affections of the defendants that they regard it as of their own flesh and blood. They took it before it was two weeks old, and have nurtured and cared

for it with parental solicitude ever since. Attempt was made to adopt the child under and according to the laws of Nebraska, but the proceedings were defective, and these proceedings should only be considered as bearing upon the motives and intentions of the defendants. Mrs. Chapman is now able to care for the child, and to give it the necessary attention and education; but defendants also have some means, and are as able to care for the child as her natural mother.

From this statement it will be seen that, so far as the immediate parties are concerned, the case is an exceedingly trying one. No matter how decided, it will bring grief and tears, and almost intolerable heartache to the defeated party. The law seems to have no scales with which to measure affairs of the heart, and has (wisely perhaps) refused to settle such matters on an emotional basis. But there are, of course, some fairly well established rules to be applied to such cases, the result of human experience and observation. It is manifestly impossible, as well as impracticable, for us to apply the test suggested by that wise man Solomon, wherein he proposed to divide the child, and give one-half to one claimant and one-half to the other. At common law the father was primarily entitled to the custody of his child, and, in case of his absence or death, the mother. But according to principles of modern jurisprudence, modified and adapted to the circumstances of our civilization, the welfare of the child must determine and control in litigation of this sort. Thus it follows that, when a parent has voluntarily parted with the custody of his child, and seeks to recover it, if his right be doubtful, or the assertion of his claim would be inequitable to others or to the child, the welfare or wishes of the child will be consulted, and, other things being equal, this consideration will be controlling. With this rule in mind, the trial court found that it was for the best interests of the child that it be left in the cus-

tody of the defendants. The parties were all before the court, and it had a much better opportunity than we have to determine this matter; and, as said in *Drumb v. Keen*, 47 Iowa, 435: "In as far as such facts have been found by the court below, this court is bound thereby, as this action must be tried as ordinary actions at law, in which the finding has the force and effect of the verdict of a jury." See, also, *Fouts v. Pierce*, 64 Iowa, 71; *Bonnett v. Bonnett*, 61 Iowa, 199; *Jenkins v. Clark*, 71 Iowa, 552.

The following quotation from one of the cases so well expresses our thought that we adopt it as a part of this opinion: "It may not be technically correct to speak of the right of the person who fills the parental place; and yet they who have filled for years the place of the parent, have discharged all the obligations of care and support, and especially when they have discharged these duties during those years of infancy, when the burden is especially heavy, when the labor and care are of a kind whose value cannot be expressed in money,—when all these labors have been performed, and the child has bloomed into bright and happy girlhood, it is but fair and proper that their previous faithfulness, and the interest and affection which these labors have created in them, should be respected. Above all things, the paramount consideration is, what will promote the interest and welfare of the child?" *Chapsky v. Wood*, 26 Kan. 650 (40 Am. Rep. 321).

The trial court having found that it was for the best interest of the child to leave it in the custody of the defendants, we are not disposed to interfere, and its judgment is AFFIRMED.