INEZ ELLEN TILTON, Appellee, v. ELLEN TILTON et al., Appellants.

OCTOBER 23, 1928.

M. E. Van Laningham, F. L. Meredith, and Parsons & Mills, for appellants.

R. R. Nesbitt, for appellee.

MORLING, J.—As in the case brought before King Solomon, two women are each claiming to be the mother of the child. Defendants claim further that it is to the interest of the child that they should have it.

Tillie Swanson will be referred to as the plaintiff. When the child was born, plaintiff was unmarried. She had been living in South Dakota, according to the undisputed evidence had had sexual intercourse with Benjamin C. Halvorson, and about the middle of April, 1926, found herself pregnant. Efforts are made in behalf of each of the women to make out the other a harlot. The plaintiff sinned with her lover, Halvorson, and cannot escape punishment therefor. Unfortunately, their sin must, to a degree, be visited upon the innocent child. The record, however, does not warrant the superimposing upon the plaintiff the stigma of being a prostitute, nor does it sustain the charge of immorality made against the defendant Ellen.

Mrs. Liter was understood to be conducting a sort of lying-in hospital in Des Moines. Plaintiff knew her. Plaintiff naturally desired as far as possible to conceal her shame, came to Des Moines about January 5, 1927, and arranged with Mrs. Liter for accommodations during her approaching confinement. It is proven beyond dispute that, on January 8, 1927, plaintiff gave birth to a female child, and that Dr. Stine was the attending physician. That defendant Ellen (the wife of defendant Carroll) was then pregnant, and that she, on January 12, 1927, gave birth to this child, is claimed by defendants, but disputed in testimony. It is not disputed that defendant Ellen was apparently making preparations for an expected child, such as providing wardrobe. One physician who took a blood test and made an external examination of the abdomen and breasts, found no evidence that Ellen had "carried a child through normal term," though he admitted that it was possible for a woman to carry a child that far (seven months) without the appearance of definite marks in her body; "but it certainly does not happen very often, if it happens at all." Another physician, who made a vaginal examination, found scarring of cervix and slight traces of stretching of the skin, which results from child birth. He says that Ellen might, and probably did, have a pregnancy, and probably gave birth to a small child. "If she had told me she had an eight- or nine-pound baby, I would doubt it." The child in controversy was small, weighing (apparently estimated) about four and one-half pounds shortly after birth. Over plaintiff's counsel's mild protest (which protest we may, in view of

the interest of the child, who cannot speak for herself, consider),—viz., "It looks to me like he could not testify in that manner, but we will admit that, if the doctor was present, he would testify as counsel has stated,"—it was agreed at the trial that another doctor would testify that, on the third day after the child was born, he found it to be of about four and one-half pounds, and evidently of premature birth. No facts from which such a conclusion could be drawn, other than that the child was small, weak, sickly, and had a sore mouth, appear. Defendant wife (Ellen) says she was married May 1, 1926. Her mother says: "They were married in June,—the 10th of June, I believe. I am not sure." Both defendants had been previously married. That the defendant husband desired a child is quite apparent. He thought his wife was pregnant, and there is considerable testimony to the effect that defendant wife, in the fall and up to January 12, 1927, had the appearance of being pregnant. Defendants nowhere claim that defendant Ellen gave birth to a child on January 8, 1927. The birth claimed to have been given by defendant's wife was at Mrs. Liter's house on January 12, 1927. There is no evidence, except that of Ellen, that any childbirth occurred at that place on that date. Defendants introduced in evidence one, and only one, birth certificate. This recites: "Full name of child adopted out * * * date of birth January 8, 1927;" the name of the father, Carroll Tilton, and of the mother, Ellen Tilton; their residence, Aberdeen, South Dakota. That this was the birth certificate of the child in controversy is defendants' own claim; but this child, according to the certificate, was born January 8th, and was "adopted out;" and defendant Ellen says that her child was born January 12th. Defendants never lived in South Dakota, and never told anyone that they did. They had nothing to do with the making out of the birth certificate. The testimony of Mrs. Liter is that it was plaintiff who gave birth to this child, and that it was on January 8th; that defendant wife came to her house before the baby was born, and she and plaintiff arranged that:

"Mrs. Tilton would have it. Mrs. Tilton did not want to adopt it; she wanted to let on as though it was her own; and they offered to take the child off Miss Swanson, because she felt she could not keep it at that time. Miss Swanson kept the baby

for 5 days, thinking that something would come up. In the meantime, Mrs. Tilton was coming over there. One day, Miss Swanson told me to phone her, and I did. Mrs. Tilton came over, and brought her clothes, and was going to bed, and let on as though the baby was hers, which she did, and I helped her out,— I thought it was pleasing them both. * * * Mrs. Tilton came to my home because there had been a girl run an ad in the paper, to adopt a baby, and Mrs. Tilton answered that. * * * I wrote out the birth certificate. I did just as Miss Swanson told me to. I signed Mrs. Tilton's name to it. I knew it was a deception.''

Plaintiff says the child was with her 5 days; that defendant Ellen ''said she was going to fool her husband; didn't want any adoption papers. That was before the child was born. I told her I wasn't in circumstances to keep it then. My folks didn't know it, and I was trying to hide the shame. I next saw her about four days afterwards * * * She came, and went to bed there. I turned the child over to her. * * * I intended to give birth to a child and let this woman have the baby.'' Another witness says:

''It was true about the baby. Miss Swanson had it. After they gave the baby to Mrs. Tilton. * * * Mrs. Tilton had the baby up by her face, and said, 'Don't you think it looks like me?' and I said, 'Well, they say children don't look like people, so I guess it will pass as yours.' She was in her nightclothes. I saw her wiping the dishes for Mrs. Liter, and she ran and got in bed when the doorbell rang. I know when Miss Swanson gave up the baby she was crying, so that Mrs. Liter asked, would I come over and pacify her when she was giving the baby away. Mrs. Liter took the baby downstairs, and I stayed with Miss Swanson. * * * I was not in the room when Miss Swanson's baby was born. It was two days old before I saw it.''

Defendant Ellen testifies that she is the mother of the child, gave natural birth to it at Mrs. Liter's place January 12, 1927, was there from 3 o'clock January 12th to January 13th, ''for the purpose of giving birth to a child, because Mrs. Liter came to my house and said it was a private home, and I would have good care. * * * As to the anaesthetic, he held a cloth under my nose, and poured it from a bottle. I suppose it was chloroform.

1002

I know I gave birth to a child, as it was beside me when I came to. I experienced the pain severely. * * * Q. Is that baby your own flesh and blood? A. I believe it is; no one has told me otherwise. The physician did not tell me, and the nurse did not say anything other than the fact that this is my child.'' (*Vide* principle of King Solomon's decision.)

Mrs. Liter says that Mrs. Tilton ''did not give birth to a child. I just helped put camphor on her, to fool her husband; to bandage her, and such as that, * * * then I put the bands around her, just like one does in a confinement case. She was in that condition when she left our house.''

Though Ellen says that she went to Mrs. Liter's because Mrs. Liter said it was a private home, and she would have good care, she left the next day. All this in Ellen's testimony is quite suggestive of the farce to which Mrs. Liter testifies. Eve and her daughters would never recognize her experience as that of a childbirth. They would be quite likely to wonder how it came that the newborn babe was beside her when she came to, and where her maternal instincts were. Ellen says that Dr. Stine attended her, and administered the anaesthetic. Dr. Stine says that he did not attend when Mrs. Tilton gave birth to a child; never saw her until the time of the trial. There is no evidence except Ellen's statement that Dr. Stine attended her. Except this, and except the testimony to the bandaging on January 12th, and the testimony of defendant Carroll that he went to his wife's bed at Mrs. Liter's, the night after she was confined, ''and she was padded like something, as near as I could tell you, like somebody, some woman, that is having a hemorrhage,'' there is no evidence of any physician's examination or attendance upon Ellen during her alleged pregnancy, or at or after childbirth, or of any care given to her by a nurse, or of any of the ordinary incidents or physical consequences of childbirth at that time.

The defendant Ellen, next day after her alleged parturition, was taken in an ambulance to her mother's home. She had the appearance of being sick, and said to the ambulance men, ''Be careful, and do not hurt me.'' The husband on January 12th was notified of the birth, and went to Mrs. Liter's, and he testifies that he is still of the belief that he is the father of the child. A blood test failed to show that the child was of the type

of either the plaintiff or the defendants. No blood test of Halvorson was made.

Without further detailing the evidence, it is sufficient to say that we are clear that the plaintiff is, and the defendant Ellen is not, the mother of the child in controversy. This conclusion is in harmony with the finding of the trial court, who had the advantage of seeing and hearing the parties and witnesses in giving testimony.

Defendants contend that the interest of the child is paramount, and that, regardless of parentage, its own good requires that it be remanded to their care and custody. They also contend that, if they are not the parents, the evidence shows that the plaintiff voluntarily gave the child to them, and has abandoned it; that they have cared for it; and that it would be inequitable to permit her now to recover it.

We have discussed these questions at length in numerous recent cases, to which we need refer no further than to give the citations. *Barry v. Reeves*, 203 Iowa 1345; *Barnett v. Blakley*, 202 Iowa 1; *Knochemus v. King*, 193 Iowa 1282; *Risting v. Sparboe*, 179 Iowa 1133; *Bonnett v. Bonnett*, 61 Iowa 199; *Miller v. Miller*, 123 Iowa 165.

The defendant husband, during his prior married life, was employed by a building material company practically all the time at $24 per week. As we understand, he is now employed by a coal company. He doubtless has given the child the best care of which he is capable. He says:

"The baby cost me right around $40 for doctor and medicines, and I bought her a bed that cost me $32.50, and all kinds of clothes that I thought the baby should need. I do believe that it is my own baby. If the court permits me to keep the child, I will do everything in the wide world for it, send it to Sunday School, see that it is properly taken care of in a moral way, send it to school. I will work with anybody that the court may appoint, to see that this child is properly reared, if they let me keep it in my home."

We may say here that the defendants claim that plaintiff gave no attention to the child from January 13, 1927, to September the same year, when plaintiff unexpectedly demanded its possession. Plaintiff claims that she had no assistance; that

the child's father had left her in her trouble; that she did not write her father until about three months before the trial, which began September 6, 1927; that he advised her to get the baby and keep it; that she found defendant Ellen working at a chop house.

"I told her I wanted my baby back. I am broken-hearted; I cannot live without her. * * * If I get the baby, I intend to take it out to Mrs. Liter's, where I am now living."

She was then working for wages. She says some day she "will have some money coming."

The trial appears to have been recessed to November 9th. Meanwhile, plaintiff sent for Halvorson. He appeared, and testified. He says he is 27 years old, employed. "If the court will award her the child, I am willing to marry her, Tillie Swanson, and make a home for her and this baby." He says he has an automobile, a little money, probably $75, and some stock in the "public utilities" and in a Masonic lodge, though he does not "know as it pays anything." He has not a full line of furniture. First knew there was a child in September. It seems that a lovers' quarrel was the cause of their separation.

The defendants do not claim to have any property except their furniture, and it would seem that they move quite frequently. On November 12, 1927, the court made an interlocutory order, finding that Halvorson and plaintiff were the parents of the child, and that they had intermarried that day; "that, upon the establishment by them of a suitable home, the care, custody, and control of their said child, the plaintiff herein, should be awarded to them." The court temporarily awarded the child to the Iowa Childrens Home Society of Des Moines, pending the establishment of such home.

"If, within 30 days from this date, the father and mother of said plaintiff, as herein determined, shall show to the satisfaction of the court that they have established a suitable home for said child, then an order will issue herein, awarding said parents the care, custody, and control of the plaintiff. If such showing be not made to the satisfaction of the court within 30 days from this date, then said Iowa Childrens Home Society shall, by further order of the court, be given the right to adopt

said child to suitable foster parents, with the approval of the court.".

Defendants complain that there is no evidence that Halvorson and plaintiff are married. We cannot assume, however, that the court, in finding that they had, on the day he entered the order, intermarried, did so without knowledge of the fact. The record does not set out what further showing was made to the court, but, on January 17, 1928, the court entered judgment awarding the child to "Tillie Swanson." Plaintiff contends that the proceeding is at law, and that the finding of the court on the facts is conclusive here, if there is evidence to sustain it. *Knochemus v. King,* 193 Iowa 1282; *Molesworth v. Baumel,* 198 Iowa 1293. We need not place our decision on this ground.

The natural parents of this child desire its custody. They have sinned, but they are attempting, as far as possible, to make amends. We must assume that they are now husband and wife. We find nothing in the record to rebut the natural presumption that they will give to their admitted offspring a father and mother's care. They are as able to do so as are the defendants. There is controversy in evidence as to whether Ellen has given to the child the care which a mother should. We need not discuss this question, further than to say that it can hardly be expected, under the circumstances, that she would have for this child the love of a natural mother, especially if she shall hereafter have a child of her own. The defendant Carroll's affection for the child, on his testimony, doubtless springs largely from his belief in his parentage, and this belief must be greatly shocked by the facts of the case as they have developed on the trial. It would be quite extraordinary if, under the circumstances, he could believe and treat the child whole-heartedly as his, especially if fortune shall favor him with one that he has better reason to know is his own. The revelations in this case at Des Moines (where the case was tried) will not be conducive to the child's happiness, living there, nor to perfect harmony and whole-hearted parental affection in defendants' home.

Defendants urge that plaintiff voluntarily gave the child away, and abandoned it; that the defendants have provided for it and nurtured it until, from a weakling, it has become large and healthy; that it would be inequitable to the child and to them now to require the child to be returned to plaintiff.

The plaintiff, when she gave the child to defendant Ellen, was in great distress, from shame and physical pain, from the desertion by the father of the child and a sense of inability to provide for it. See *Miller v. Miller*, 123 Iowa 165, 169. The child has not attained an age at which it has become attached to defendants. It does not appear that plaintiff lost interest in her offspring or abandoned it. That at birth, and since, she has had a mother's yearning for it, is certain. It cannot be said that plaintiff's delay was unreasonable. The child, as defendants concede, is not a chattel. Its custody is not to be determined upon the basis of property rights in it. Defendants might, about the time of the birth, have procured the child by adoption, but defendant Ellen refused to adopt, and instead, endeavored to perpetrate an imposture, and to hoax, if not her husband and relatives, at least the public. Defendants have no legal right to the child, and their case does not appeal to the equitable considerations of the court which they invoke. On the merits of the case as here presented, we are entirely satisfied with the judgment of the trial court.

It is ordered that the child be immediately surrendered to Tillie Swanson.—*Affirmed.*

Evans, Faville, De Graff, Albert, Kindig, and Wagner, JJ., concur.

Stevens, C. J., not participating.