GLORIA JEAN JOINER, by THOMAS L. JOINER (father), appellant,
v. WALLACE KNIERIEM et ux., appellees.

No. 47944.

(Reported in 52 N.W.2d 21)

MARCH 4, 1952.

Harlyn A. Stoebe, of Humboldt, for appellant.

Garfield, Baker & Miller, of Humboldt, for appellees.

BLISS, J.—Thomas L. Joiner will be referred to as the plaintiff. The petition, filed December 14, 1949, alleged that the action was brought by him, as father and next friend of Gloria Jean Joiner, who, since the death of her mother and custodian, has been illegally restrained in the home of defendants, and his demand for her return to him has been refused; all of which was against the best interests of the child. The answer of defendants admitted all of these allegations other than those averring the illegal restraint of Gloria and that her best interests called for her return to the home of her father. The answer alleged that defendants were the maternal grandparents of Gloria; that she and her mother made their home with them since the divorce of the child's parents; that Gloria was rightfully in their home and was being cared for by them, and it was for her best interests and welfare to remain with them and to not be returned to her father, who is not a fit and proper person to have her care and custody. Dismissal of the petition was prayed and that a decree be entered finding the best interests of the child would be served by permitting the child to remain with the defendants. The reply denied the affirmative allegations of the answer.

At the beginning of the trial, plaintiff filed a motion that under the pleadings he had made a prima facie case and that defendants should proceed with their evidence. The court ruled that the burden of proof was on the defendants. They accepted the ruling and the case was tried on that theory. At the close of all the evidence the court reaffirmed its ruling. No issue thereon is before us.

All those connected with the matters involved in this litigation lived in the country in Corinth Township in Humboldt County, a few miles south of Dakota City, the county seat, and the city of Humboldt. The defendants, Wallace and Alice Knieriem, at the time of the trial were respectively fifty-seven and fifty-eight years old. Mr. Knieriem has been a resident of the county all of his life. He was born on the farm on which he now lives and owns. Four children were born to the defendants. The oldest is Donald, then twin daughters, one of whom was Grace, the mother of the little girl in controversy, and the youngest child is Doris. All of the children married, and there is no one living with the defendants now but Gloria Jean Joiner, named as plaintiff, who was six years old at the time of the trial.

The defendants' daughter Grace married Thomas L. Joiner, the plaintiff. They lived as tenants on a farm less than two miles from defendants' farm. Another young couple, Keith O'Donnell and his wife, Betty, were farming in the same community. Betty and Grace were cousins. In the summer of 1947, Betty and Thomas L. Joiner were seen together considerably on the streets of Humboldt and elsewhere, and in Joiner's car. This caused discord in both homes. The O'Donnell's ceased living together on August 7, 1947, and were divorced on September 8, 1947. They had one child, Barbara, about four years old at that time, and the decree gave her custody to her mother.

On October 2, 1947, Gloria Jean and her mother, Grace Joiner, as the latter expressed it to her father, were "pushed" out of their home, and Gloria Jean, then about four years old, on reaching the defendants' home said: "Her daddy didn't like her and her mamma any more and she had come to stay with her Grandma." The plaintiff, testifying in his own behalf on direct examination, said: "At the time of the divorce action I never ordered my wife out of the home. I told her it was up to her, either she would leave or I would leave, and I offered to leave first."

Grace Joiner procured a divorce from the plaintiff, Thomas L. Joiner, on October 14, 1947. He did not appear and contest it and no lawyer advised him or appeared for him. On December 2, 1947, he and Betty O'Donnell were married and she and Barbara moved into the home that Grace and Gloria Jean had

left. On March 20, 1948, at the Lutheran Hospital in Fort Dodge, Iowa, Betty (O'Donnell) Joiner gave birth to a baby boy. Although it was undoubtedly conceived when she was Mrs. O'Donnell, in furnishing the information for the birth certificate she stated that the father of the child was Tom Joiner. This boy is named Michael Joiner. On cross-examination, the plaintiff, Thomas L. Joiner, was asked, "When was your son, Michael, born, Thomas?" His answer was "March 20."

In further cross-examination he testified:

"I don't suppose she (Grace) wanted her home broken up at all. Until the matter of six weeks or two months prior to the divorce, everything had gone along about as good as you could expect. I did not tell my wife just before the divorce that Betty was pregnant and that provision would have to be made for her coming into the home and her getting out. Q. But that was the reason for the divorce wasn't it? A. No. Q. Partly? A. That may have had a little bit to do with it but not very much."

Betty Joiner as a witness for plaintiff, on cross-examination, testified: "I was divorced on September 8 and at that time I had only one child. So far as I know there was no mention made to any one at that time of the approaching birth of another child. * * * So far as I know, my former husband had no knowledge that I was expecting another child." Objection having been made to the question, "Who knew besides yourself?", defendants stated that they would call her as their own witness later on.

Defendants used Betty Joiner as their witness on rebuttal. She testified to the birth of Michael on March 20, 1948, and that she gave the information that was placed on the birth certificate, and that the certificate showed Tom Joiner as the father of the child. She was then asked, "Is he the father of it?" Plaintiff's attorney then objected that the answer would "tend to place her in public shame and ignominy." The reporter having read the question, she said, "I would rather not answer." The Court: "For the reasons in the objection stated by your counsel? A. Yes."

Keith O'Donnell was a witness for the defendants. He testified that he knew of his former wife's giving birth to a child in March 1948, "and at no time before my ex-wife was granted a

divorce did my wife ever tell me that she was pregnant. I learned of it after the divorce and shortly prior to the time she was married to Thomas Joiner, which information I gained from observation. There has been no claim made of me for support of this second child. There is no provision in my divorce decree for the care or custody or support for any child other than Barbara. I knew Thomas Joiner and my ex-wife were running around together about a year before our divorce. I had seen them together. These occasions were among our friends. I had no knowledge of the two of them being alone together at any time before we separated but I did know it before the divorce."

The decree divorcing Grace and Thomas L. Joiner gave the custody and care of Gloria Jean to her mother with right of visitation to the father. He retained all of their property except some household goods, and he gave his wife his note for $5000 with chattel security, payable $500 annually, beginning on January 2, 1948. The decree provided for monthly payments of $40 for the support of Gloria. It also required him to pay the premium on a $1000 insurance policy on the life of Grace with Gloria as beneficiary, and a policy of insurance for $1000 on the life of Gloria payable to himself and Grace equally, and also a paid-up policy on his own life for $2000 with Gloria as the beneficiary. These requirements had all been complied with up to the time of the trial, except the support payment for November 1949. Plaintiff said he did not make this payment because Grace told him she was depositing the monthly payments in the bank in an account for Gloria, and he thought she should be spending more money for Gloria. He said that Grace was always "a little too thrifty."

Gloria Jean and her mother lived in the defendants' home from October 2, 1947 until in May 1948. She then took Gloria with her and kept house for an elderly gentleman, Andrew Smith, until November 1948. She and Gloria then returned to the defendants' home and stayed there until December 9, 1948, when they went to Dakota City to the home of Mrs. Eisler, her maternal grandmother, about eighty years old, to take care of her. They stayed there until June 1, 1949, and then returned to the defendants' home and remained there until the following September when they went back to the home of Mrs. Eisler. Grace and

Gloria Jean came to the home of defendants for the Thanksgiving Day dinner in 1949, and on that day at that home Grace took her own life.

She had been ill during the summer of 1949. Her ailment was diagnosed as a case of "nerves." During this time she lost fifteen or twenty pounds in weight and was unable to walk without falling down. As expressed by a witness who knew Grace for many years, it was his opinion that she committed suicide because she was heartbroken. The facts we have related are without dispute and they tell a tale that needs no comment.

The defendants own an improved 160-acre farm with adequate equipment and stock for its proper operation. There was a $4000 mortgage on the land, which they were about to pay when this litigation arose. They are respected citizens in the community. They have maintained a good home and properly reared their children. Each Sunday the children attended church services in Humboldt. They attended the grade schools and high school. Approximately twenty witnesses testified to these matters and to the mutual love and affection between Gloria and her grandparents, and the good care and kind and thoughtful attention which she received from them, and of the happiness in the home. It was the opinion of these witnesses that the defendants' home would be a good one for Gloria. No witness on either side spoke a word in derogation of the defendants or of their home, or of their fitness to have the custody and care of Gloria. Mrs. Minnie McFarland, seventy-two years old, the grandmother of Thomas L. Joiner, lived just across the road from the defendants and had known them all of their lives. She testified favorably for them respecting the matters noted in this paragraph. Grace was in her home on the day of her death. She and Gloria were frequently in her home. She testified:

"She [Grace] told me she wanted him [Tom Joiner] to take her [Gloria] to his folks when he visited with her, but she said she didn't want the child to be with her stepmother—with Thomas's present wife. She told me that on several occasions. When Grace and Gloria visited me Gloria showed some affection for me but not as much as she shows for her grandmother. Gloria never lived with me. She plays in my home with a doll and is quite

content. She has never talked about going home [to her father] when they were at my home."

Ernest Hinners had testified for defendants. He and his wife were later used as witnesses by plaintiff to testify to the neatness and cleanliness of his home when they were there just the week before. Mrs. Hinners on cross-examination testified:

"The purpose of our visit was in the interests of Gloria Jean. Well, here was a little girl in very tragic circumstances being pulled between two families. I was interested in the future of this little girl, just what was to become of her, in a home that had been broken twice, you might say, with three children— three different families—where often two families don't work in any home, let alone three. There are some children that are aggressive and will hold their own; there are others who are timid and who will be the brunt of all that might go on. Q. You thought Gloria Jean was of the timid type? A. She is very timid. Q. Well, isn't it a fact you were there, knowing the circumstances, to try to prevail upon the Joiners to leave Gloria Jean in the home of the grandparents? A. Yes, I did. I thought it was better for all concerned, for the two families, for everything that would come up, with the little girl in that home, if they couldn't get together and be willing to assist either family, and Knieriems agreed, but we couldn't come to any agreement with Joiners."

While Grace and Gloria were at the home of Mrs. Eisler in Dakota City Gloria attended the school there. She was getting along so well that defendants thought it best to let her finish the school year there after her mother's death, and Mr. Knieriem took her to school in the morning from his home and drove to school at 3:30 each afternoon to get her. For the following years defendants planned for her to attend the school in Humboldt, and to ride to and from school in the school bus which passes their home.

Several witnesses for defendants testified that the general reputation in the community of both Thomas L. Joiner and his wife, Betty, was either "not good", "not too good" or "bad." He was not generally regarded in the community as one who "neighbored" with those who lived in his vicinity. He testified: "I make it a practice to leave the rest of my neighbors strictly alone and

they do not call at my home. Not over two or three of my neighbors have been in my home." His witnesses were largely those with whom he had business relations and knew little about him otherwise. He has visited with Gloria quite regularly both at the defendants' home and more frequently in the home of Mr. Smith, where Grace was housekeeper, and in the home of Mrs. Eisler. He took Gloria to picture shows several times. Grace had told him not to take Gloria to his home. He said he took her to his home once and when Grace learned of it she told him not to do it again. On the occasion that he took Gloria to his home he said, "she gave the appearance of being half scared to death." The Joiner and O'Donnell families had not visited together a great deal and Betty's relations and acquaintance with Gloria were limited. Her only testimony, with respect to custody of Gloria, was: "I am prepared to help provide the child with a home. I am acquainted with my husband's daughter and like her very much."

In its findings the trial court stated:

"This court visited with Gloria Jean, with no one but the court reporter present, and at a time when no one had any advance notice thereof. Counsel for both parties were notified just prior to the visit and were present in an adjoining but separate room during such visit. Gloria Jean visited very freely and with no apparent serious embarrassment. She expressed love and affection for both the plaintiff and defendants, and the desire to live with each a part of the time. There was no indication that the defendants or Grace Joiner had ever told her or done anything to prejudice her against her father. Gloria Jean was nicely dressed, was neat and clean and had the appearance and demeanor of a very nice little girl. She likes her school and her teacher and her schoolmates. * * *

"In defendants * * * we find maternal grandparents * * * a good comfortable home, and love and affection and attachment for Gloria Jean. During the two years and two months prior to the death of her mother, Gloria Jean spent about eleven months time in this home. While her mother was ill during the summer of 1949 her grandparents had almost her entire care. It is the place to which she and her mother always returned. There is no

testimony of a derogatory nature as to the moral character of the defendants. * * *

"In plaintiff's home Gloria Jean would have a stepmother who came between her natural father and natural mother; she would have a stepsister one year older than she, and a half brother five years younger. In the home there would then be three children, each and all of different parentage. * * *

"The defendants have as a matter of fact and law sustained the burden of proof herein, and under the preponderance of the evidence * * * have overcome any and all rights of the plaintiff to the care, custody and control of Gloria Jean Joiner; * * * they are fit and proper persons and economically able to have the care, custody and control of and to rear and educate Gloria, and that her best interests and welfare will thereby be best served."

The court so decreed and further decreed that the father should have the right of reasonable visitation and should be entitled to have Gloria spend the month of June or July with him each year, and part of the Christmas vacation, and the right to visit and have the companionship of her at reasonable times and places during the remainder of each year.

I. The legal propositions upon which the plaintiff relies are chiefly the following: 1. Sections 668.1 and 668.2, Code of 1950. The first provides: "Parents are the natural guardians of the persons of their minor children, and equally entitled to their care and custody."

The second section provides: "The surviving parent becomes such guardian * * *."

2. "The right to custody of a minor child, and the ensuing presumption that the welfare of the child will be best subserved by being with a natural parent, will entitle the parent to custody as against a third person unless said right has been abolished or waived in favor of said person by abandonment, contract or otherwise, or unless it is shown by a preponderance of evidence that the interests of said child and its welfare will be best served by award of custody to one other than the natural parent."

The appeal has been ably argued on each side with extensive citation of, and quotation from, pertinent authorities. Plaintiff contends that defendants do not give due recognition or consideration to his rights under said statutes or under the

presumption. He also argues that there has been some confusion and contradiction in the decisions of this court respecting those rights. There has been no change in the statutory provisions since the Code of 1873, and this court has consistently recognized parental rights thereunder. But the statutory parental right of child custody is not an absolute, indefeasible, vested right. It is an absolute right if the parent is properly qualified for the custody. But this right is not different from other rights. The one entitled to the right of custody may deprive himself of the right by abandonment, waiver, agreement or otherwise. He may lose it through misfortune. He may forfeit the right by such neglect, disregard or misconduct that the welfare and best interests of the child require the care and custody of another.

As the court said in Knochemus v. King (DeGraff, J.) 193 Iowa 1282, 1286, 1287, 188 N.W. 957, 959: "All courts recognize that the legal dominion which the law gives to the natural parent has well defined limitations. It is a dominion in the nature of a trust in which the child is the beneficiary. When the parent fails to perform the duties and obligations which that trust imposes, it may be said that the parent forfeits the legal dominion over the child. The paramount consideration after all is what is best for the child, and it is the duty of a court to leave the child where its interests, welfare and happiness will be best served."

In In re Guardianship of Lally v. Fitz Henry (Kinne, J.) 85 Iowa 49, 52, 53, 51 N.W. 1155, 1156, 16 L. R. A. 681, the court said: "Notwithstanding the statutory provisions, the weight of modern decisions is clearly favorable to the holding that the right of the parent to the custody of the child is not absolute. It must be determined, in a case like this, in view of the best interests of the child. That is the controlling consideration. * * * Now, it is clear that a parent may lose the right of custody by his own voluntary act, by misconduct, and even sometimes by misfortune. He may lead such a grossly immoral and profligate life, may become so habituated to the use of intoxicants as to be utterly unfit to have the custody of a child, or may by neglect to provide for it justify a court in refusing to place it in his custody."

Where the custody of a minor child has been involved in litigation because the parental statutory right has been challenged, or it has been parted with or lost for any of the causes

set forth above, and the child is in other proper custodial care, or where the litigation has been between the parents, each of whom had the same statutory right, or between one parent and a third party, this court, from its early cases to its latest, has held uniformly that the parental rights were secondary, and that the primary and paramount consideration for the guidance of the court was the welfare and best interests of the child. Drumb v. Keen, 47 Iowa 435, 437, 438; Bonnett v. Bonnett, 61 Iowa 199, 202, 203, 16 N.W. 91, 47 Am. Rep. 810; Fouts v. Pierce, 64 Iowa 71, 73, 19 N.W. 854; McDonald v. Stitt, 118 Iowa 199, 202, 91 N.W. 1031; Holmes v. Derrig, 127 Iowa 625, 631, 103 N.W. 973; Smith v. Haas, 132 Iowa 493, 495, 109 N.W. 1075; Smidt v. Benenga, 140 Iowa 399, 401, 402, 118 N.W. 439; Risting v. Sparboe, 179 Iowa 1133, 1136, 1137, 162 N.W. 592, L. R. A. 1917E 318; Ladd v. Ladd, 188 Iowa 351, 355, 356, 176 N.W. 211; Werling v. Heggen, 208 Iowa 908, 909, 910, 225 N.W. 952; Jensen v. Sorenson, 211 Iowa 354, 362–366, 233 N.W. 717; In re Guardianship of McFarland, 214 Iowa 417, 425, 428, 429, 239 N.W. 702; Adair v. Clure, 218 Iowa 482, 484–488, 255 N.W. 658; Allender v. Selders, 227 Iowa 1324, 1331–1333, 291 N.W. 176; Ellison v. Platts, 226 Iowa 1211, 1215, 286 N.W. 413; Lancey v. Shelley, 232 Iowa 178, 182–184, 2 N.W.2d 781; Wooley v. Schoop, 234 Iowa 657, 12 N.W.2d 597; Paulson v. Windelow, 236 Iowa 1011, 1016–1018, 20 N.W.2d 470; Lursen v. Henrichs, 239 Iowa 1009, 1013–1015, 33 N.W.2d 383; Zuerrer v. Zuerrer, 238 Iowa 402, 408, 27 N.W.2d 260; Voy v. Voy, 241 Iowa 673, 675, 41 N.W.2d 869; Pelton v. Halverson, 240 Iowa 184, 191–193, 35 N.W.2d 759; Scheffers v. Scheffers, 242 Iowa 563, 569–571, 47 N.W.2d 157, 160, 161.

II. Although the welfare of the minor child is the controlling consideration in custodial cases, this does not mean that parental rights are disregarded. As said in Hadley v. Forrest, 112 Iowa 125, 126, 127, 83 N.W. 822: "The parent's right to the custody of the child, while recognized and allowed strong weight, is not absolute, and will not be enforced against the serious interests of the child. It is not meant by this that any person better able than the parents to provide for the wants of an infant child may deprive the natural guardians of its custody; but we do

mean to assert that the child's vital welfare, present and future, is not to be sacrificed to the parent's claim."

In Holmes v. Derrig, supra, 127 Iowa 625, 628, the court stated: "It is true that the dominant consideration in cases of this kind is the interest of the infant, but the parent or other natural guardian of the child has rights in the premises which cannot be ignored. Were it otherwise, and the award of the custody of the infant were made to depend upon the comparative wealth and financial prospects of the claimants, then no parent in the lowlier walks would be safe in the possession and guardianship of his own children against the roving fancy of a rich claimant who may find it less burdensome to adopt than to produce." See also Dunkin v. Seifert, 123 Iowa 64, 67, 98 N.W. 558; Miller v. Miller, 123 Iowa 165, 171, 172, 98 N.W. 631; Allender v. Selders, supra, 227 Iowa 1324, 1332; Adair v. Clure, supra, 218 Iowa 482, 485; Lancey v. Shelley, supra, 232 Iowa 178, 182, where we said: "Naturally, the rights of the parent must be given full consideration."

III. It is true, as stated in plaintiff's second proposition, that the law raises a strong presumption that the minor child's welfare will be best subserved in the care, custody and control of its parents or parent. We have so held several times. See Bonnarens v. Klett, 213 Iowa 1286, 1288, 1289, 241 N.W. 483; Risting v. Sparboe, supra, 179 Iowa 1133, 1136–1139; In re Guardianship of McFarland, supra, 214 Iowa 417, 428, 429; Allender v. Selders, supra, 227 Iowa 1324, 1332; Werling v. Heggen, supra, 208 Iowa 908, 909; Wooley v. Schoop, supra, 234 Iowa 657, 660–664; Lancey v. Shelley, supra, 232 Iowa 178, 182; Paulson v. Windelow, supra, 236 Iowa 1011, 1016, 1017; Winter v. Winter, 184 Iowa 85, 87, 166 N.W. 274, where the court said: "In such a contest, the father, as the only surviving parent, starts with a very strong presumption in his favor."

IV. The trial court heard and saw the parties and the witnesses. His finding that it was for the best interests of Gloria to remain in the care, custody and control of the defendants is entitled to weight and the consideration of this court. Maron v. Maron, 238 Iowa 587, 591, 28 N.W.2d 17; Dow v. Dow, 240 Iowa 145, 151, 35 N.W.2d 853; Voy v. Voy, supra, 241 Iowa 673, 675; Bell v. Bell, 240 Iowa 934, 938, 38 N.W.2d 658; Nichols v.

Nichols, 239 Iowa 1173, 1180, 34 N.W.2d 187; Wood v. Wood, 220 Iowa 441, 447, 262 N.W. 773; Tilton v. Tilton, 206 Iowa 998, 1003, 221 N.W. 552; McDonald v. Stitt, supra, 118 Iowa 199, 203.

V. The wishes of the deceased mother that her child be cared for by the defendants and that she not be in the home of the plaintiff and his wife is entitled to weight and consideration. Holmes v. Derrig, supra, 127 Iowa 625, 631; In re Guardianship of O'Connell, 102 Iowa 355, 356, 71 N.W. 211; Lancey v. Shelley, supra, 232 Iowa 178, 186.

■ We are fully convinced from a reading of the record and the authorities that the welfare and the best interests of Gloria Jean will be preserved and promoted in the good and comfortable home of the defendants, where she will be wholesomely cared for, reared and educated with an inherent love and interest which has been intensified and increased by her misfortunes. To take her from this home, where her mother on her last day planned that she should be, would be another catastrophe in her young life.

The plaintiff by his transgressions, and by his breaches of fidelity, respect, honor, and right conduct, which he owed to Gloria and her mother, has forfeited all custodial rights, except as limited in the decree, which were his under both the statute and parental presumption. To place Gloria in the old home, but a different household, where every other member of it, and every association, would be a constant reminder of the tragedies forced upon her, would be grievously unfair to her.

The decree is—Affirmed.

All JUSTICES concur except GARFIELD, J., who takes no part.